**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRANCOA CHEMICAL CORPORATION, Respondent.**

No. 5942.

United States Court of Appeals First Circuit.

Heard May 3, 1962.

Decided June 11, 1962.

Allison W. Brown, Jr., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Washington, D. C., was on brief, for petitioner.

Vernon C. Stoneman, Boston, Mass., with whom Alan S. Miller, Newton Center, Mass., and Stoneman & Chandler, Boston, Mass., were on brief, for respondent.

Before HARTIGAN and ALDRICH, Circuit Judges, and GIGNOUX, District Judge.

ALDRICH, Circuit Judge.

This petition for enforcement of an order to bargain raises a number of questions with regard to misleading union literature prior to an election and to the actions of the Board in handling the employer's objections thereafter. It raises them in sharp focus. In its reply brief the Board states that the procedure followed in "this case has been developed out of long years' experience in handling proceedings of this type," which we take to mean that we have before us the Board's general views and not simply a special situation.

On April 6, 1959, at the request of the International Union of Electrical, Radio and Machine Workers, AFL-CIO, known as the IUE, a representation election was scheduled at the plant of respondent Trancoa Chemical Corporation. The union's campaign had been proceeding since December 1958. On April 5 it distributed a leaflet consisting of a single sheet, printed on both sides, and folded once. The first of the resulting four pages proclaimed that voting for the union would mean "more money in your paycheck;" indicated that Trancoa was not "paying wages and benefits comparable to other workers in our industry;" and concluded, "we [workers] can't find out the truth * * * but

IUE has the facts and figures and we can see for ourselves! ! ! SEE INSIDE." The two inside pages contained alleged facts and figures about three contracts the union had allegedly negotiated. The back page consisted of generalizations, one half of which concerned the dangers the employees were said to face from radioactive materials and a poison, and against which the union offered to protect them. The following day, immediately before the election, the company published a partial reply.

The balloting disclosed 85 in favor of the union, 47 against and 10 challenged or void.[1] No question arises as to the tally. The company filed objections to the election on the basis of misrepresentations in the leaflet. The Regional Director appointed an investigator who made an ex parte investigation, following which he overruled the objections. The company filed detailed objections to his report, but the Board upheld the director and certified the election. The company refused to accept the union and bargain with it, from which has come the present unfair labor practice charge. At the hearing on this charge the trial examiner, upon specific instructions from the Board, ruled that he could accept only evidence discovered since the company's original objections. He found against the company. His action was confirmed by the Board, which now seeks a decree enforcing its order that the company bargain.

Respondent raises the following issues: (1) The Board's alleged view that misrepresentations are to be overlooked if,

in its opinion, they were not so misleading as necessarily to "preclude the election results from reflecting the true desires of the employees." (2) The Board's refusal to consider "exaggerations, incomplete disclosures or half truths," or anything not amounting to "forgery or other campaign trickery." (3) The conclusion that misrepresentations may be disregarded if the company has had an opportunity to dispute them. (4) The refusal, in the absence of proof of "arbitrary and capricious" action in connection with the certification, to reconsider at the unfair labor practice hearing any matter previously decided, whether correctly or not.

The underlying question is how far the "facts and figures" supplied in the union's leaflet were materially untrue. The company, apparently failing to realize the negative effect of pressing inconsequentialities, has over-extended all stages of the proceeding. Campaign material is not to be subjected to an electron microscope. At the same time we are not persuaded by the Board's view that the effect of even major misrepresentations may be diminished if, in the total picture, they are few in number. It is particularly unsound where, as in the case of the Monsanto contract here, some of the other misstatements, although not substantial in themselves are at least of some consequence. Many a girl has been seduced one step at a time.[2]

Respondent's first major complaint concerns the second, or Knolls Atomic Power Laboratory contract. The published grades and wage rates were con-

---

1. The Board considered the relative one-sidedness of the election a reason to discount the consequences of the union's leaflet. We note this argument only to remark that exactly the opposite conclusion is possible. In N.L.R.B. v. Gorbea, Perez & Morell, 1 Cir., 1962, 300 F.2d 886, the Board in argument dismissed the fact that a large number of employees testified in the company's favor by saying that it went only to show how successfully they could be led.

2. The leaflet's first inside page purported to set forth the terms of a contract the union had negotiated with Monsanto Chem-

ical Corporation. Along with the quoted table of grades and wages it was stated that there was "premium pay" for "Saturday as such." Only a careful reading would disclose that the premium pay was not time and one-half. The advertised provision for "military leave allowance" proved to be simply a voluntarily-adopted company policy to pay for summer encampments; advertised "medical examinations" were in fact only after absence due to illness, and the "maximum" insurance benefits, the only ones the leaflet gave figures for, were available to a mere handful of employees. While these matters are

spicuously stated to be for "IUE Members Doing Similar Work," adding, in connection with insurance benefits, "and they don't have our hazardous conditions." The union omitted, however, the word "Atomic" from the employer's title, and omitted the special letters designating the local involved as atomic-working. This was scarcely inadvertent. Without the omissions its remark about less hazardous conditions would have been demonstrably false. In fact, Knolls' conditions were not less hazardous, but more so. We are surprised at the Board's suggestion that this is not a matter of moment. In addition, the company complains that the union advertised the Knolls' contract as providing piecework pay "upward to $4.00 and better per hour" and a "Severance Pay Plan." The record does not permit us to say whether or not severance pay which was provided only in case of a total shutdown of the plant is within the commonly understood meaning of a "severance pay plan," but we must agree with the company that $4.00 for pieceworkers when that could be achieved only during premium pay periods was highly misleading. This seems a good example of a "half truth" which the Board feels it is appropriate to disregard.[3]

The union's third alleged contract was with Metal Hydrides. The company makes much of the fact that the Metal Hydrides plant shut down before the contract went into effect and that the union failed to disclose this. The relevancy of the contract was the fact that the union had negotiated it. This was in no wise affected by the further fact that the plant closed because of loss of its government business due to a change in government requirements. The company's complaint that no employee ever actually received these wages would have been irrelevant to the union's having negotiated the contract except for one circumstance, not discovered by respondent until after certification. The total agreement with Metal Hydrides was that the wages and benefits advertised in the union's leaflet would be effective only if the company continued in special government work, but that if it engaged in commercial work new terms would be negotiated. The announced identity between Metal Hydrides and Trancoa was thus broken; precisely where it occurred there was no contract. We agree with the Board that the union did not have to parade its poor agreements along with its good ones. But it was a manifest misrepresentation to indicate that it had achieved a similar contract when there was such a pertinent exception.[4]

The union further advertised that its Metal Hydrides contract contained "Pension and severance pay plan Fully paid for by company." Even on the assumption that the contract was in full force and effect these particular statements were pure invention. No such plans had been negotiated or offered, whether paid for by the company or otherwise. It must be obvious that this falsification reflected on every other advertised term of the Metal Hydrides agreement. Hourly rates with a pension, and without, are different matters.

Finally, the last page of the leaflet was devoted to the union's assertion that it was planning for the future and for its members' protection. Prominent mention was made of the growing use of radioactive materials. "[T]hese mate-

---

not worth considering individually, taken as a whole they produced far less than a fair picture.

3. We shall not further refer to the Board's frequently announced policy of countenancing "exaggerations, incomplete disclosures or half truths," except to say that we do not approve of disposition by generalization, including the reverse of the Board's as exemplified by Allis-Chalmers

Mfg. Co. v. N.L.R.B., 7 Cir., 1958, 261 F.2d 613, 616. A half truth means a half lie, and a half lie may be, or may not be, a substantial misrepresentation.

4. We are reminded of the lady who sought to persuade her butcher to meet the price quoted for lamb chops across the street. When asked why she didn't buy there she replied, "They don't have any."

rials can be very dangerous, but the danger can't be seen or felt. Are radioactive materials being used in your plant? If so, have you been told about it? And what kind of safety measures have been taken?" After further development of this none too veiled insinuation, entirely unjustified in fact, the leaflet stated, "Not long ago beryllium poisioning claimed the lives of many workers in this industry and in our plant." The inclusion of respondent's plant was completely false.

█ This is a sorry record. Of the three contracts advertised, the first was at least considerably exaggerated; the benefits of the second were paraded under the general assertion that the working conditions were less hazardous when actually they were more so, and at least one benefit was substantially misstated; the third contract was not in fact negotiated for competitive commercial work, and was claimed to contain fully paid-for pension and severance plans, certainly substantial matters, when it contained none at all. Finally, with no basis in fact, there was the emotional appeal to apprehensions over radioactivity and poisons.

█ There is no suggestion that the leaflet was prepared to meet some last-minute impropriety by the company. Nor was the union otherwise pressed. The election campaign had been in progress over three months, and the contracts described had been negotiated before that. It is obvious that the whole proceeding was a calculated move, at a deliberately selected moment when, due to the shortness of time to learn the true facts or effectively reach the employees, the company's ability to correct misstatements would be minimal. The Board's response that the company had an opportunity to reply and did so "effectively" is, in our opinion, simply not so. The employees, except for ten per cent who did not see it at all, received the company's leaflet fifteen minutes before they voted.

One may wonder how many conversions are made at such a moment. Furthermore, there is an important distinction between a reply and what the Board chose to regard in oral argument as "refutation." As to some matters a reply may be a refutation; but to others, not. If a union says it negotiated such and such contracts with A, B & C, and the company says it did not, whom are the employees more likely to believe? We think there can be little doubt. There is much merit in the court's suggestion in N. L. R. B. v. Houston Chronicle Publishing Co., 5 Cir., 1962, 300 F.2d 273, 279, that the very attempt to deny what the union presumably has the only first-hand knowledge of may put the company in a worse light. Moreover, the company made no reply, and there is no suggestion that it had the opportunity to do so, to any but one of the Monsanto half truths listed in fn. 2, supra, to the Knolls exaggerated pieceworker rate, to the implication that the Metal Hydrides agreement covered commercial work, and the false assertion that that contract contained company-paid plans for pension and severance pay. These misrepresentations alone were substantial and serious.

We do not believe that even the company's positive denial that it had radioactive or other lethal poisons could be said to be a complete refutation. The Board describes the union's statements as propaganda. Giving them a name does not dismiss them. This was a subject charged with emotion. Even in a court trial, where an authoritative judge can instruct a jury to disregard prejudicial matter, it is recognized that there are limits. Here there was no instruction, but merely a partisan counter-assertion. The Board says the employees could be counted on to know the union was wrong. There is no evidence that they knew. The union insidiously put in its statement, "the danger can't be seen or felt." We do not think the union made a half-page statement that it expected would affect no one.[5]

5. In its brief the Board concludes, "the common sense of the electorate can be trusted to evaluate and fairly discount campaign utterances." If this means to

A word about standards. We do not accept the Board's proposition that reversal of an unfair labor practice finding for non-acceptance of an election requires proof of "arbitrary and capricious" action. It is desirable in the interests of giving a union immediate status that certification be permitted without a hearing. And we would agree that on matters of procedure the Board should have almost unlimited powers. But this does not mean that if the company seeks eventual review substantive rights are not to be given customary consideration. N. L. R. B. v. Houston Chronicle Publishing Co., supra; cf. Cross Company v. N. L. R. B., 6 Cir., 1961, 286 F.2d 799. The act provides that the employees shall have representatives "of their own choosing." 29 U.S.C.A. § 157. We do not think that the Board's view of what impairs freedom of choice is more sacrosanct than its other fact-finding powers. Likewise, the Board's corollary ruling that the trial examiner at the unfair labor practice hearing could reconsider no matters previously decided was error. Respondent is entitled to have all of the misrepresentations viewed together.[6]

We are not clear whether the Board's expression "preclude * * * freedom of choice" means that the burden is upon the respondent to show that the employees were necessarily misled, or only that it is sufficiently likely that it cannot be told whether they were or were not. The latter is the appropriate rule. N. L. R. B. v. Trinity Steel Co., 5 Cir., 1954, 214 F.2d 120. Nor are we entirely clear what is the Board's view of the role of deliberateness, but it seems to be, since it restricts consideration to "forgery or other campaign trickery," that no misrepresentation, no matter how serious, is material if it was not intentionally false. See also Cross Co. v. N. L. R. B., supra. Since it is clear that the misstatements here were consciously false we are not faced with the question of how far the Board can properly depart from ordinary rescission principles, but we make one comment. In speaking of the fact that there was no affirmative evidence that any employee relied on certain of the misstatements (an odd remark since the Board does not ordinarily take employee testimony, see Cross Co. v. N. L. R. B., supra, 286 F.2d at 801, and took none here), the Board fails to realize the significance of intentional fraud. An innocent mistake might occur for a number of reasons. One must regard deliberateness as an admission that the matter was important. No one is in a better position than the union to know what the voters need to be told.

Finally, we are not persuaded by the Board's claim that if it must "police" election campaigns, by which seemingly it means be required to look at something beyond the most patent outrage, it will be overcome by a flood of objections to certification. Arguments that tribunals are too busy to do their duty, cf. LaBuy v. Howes Leather Co.,

know instinctively what factual statements are untrue, this is a bit of hyperbole this court will not indulge in. Nor can we help observing that the Board would apply no such standards if the misrepresentation had been by an employer. If an employer merely makes a prediction that unionization will prevent raises, this is serious unfair labor practice unless the employer can demonstrate facts to prove it. N.L.R.B. v. Whitelite Products Division, 1 Cir., 1962, 298 F.2d 12, cert. den. 5/21/62. But cf. Olson Rug Co. v. N.L.R.B., 7 Cir., 1958, 260 F.2d 255, 256, fn. 1.

6. We are not sure as to the full measure of this ruling. During the hearing counsel for the general counsel obtained a telegraphed ruling from the Board, as a result of which all evidence already introduced but not shown to have been newly discovered was struck from the record. To the extent that the respondent was seeking reconsideration of something previously decided, this ruling was correct. N.L.R.B. v. Worcester Woolen Mills Corp., 1 Cir., 1948, 170 F.2d 13. But to the extent it led the trial examiner to consider whether the document was substantially misleading viewed only in the light of matters newly discovered and not as a whole it was error.

1957, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed. 2d 290, or that it is more expeditious not to recognize rights, are not agreeable ones. Moreover, we think it a false issue. We cannot believe that unions as a class choose to fabricate, or that it is hopeless to supervise them. However, some persons will make misstatements when they are allowed to. If the Board tolerates low standards, that is where they will stop. The Board twice asserts that it does not "condone" untruthfulness, but standards will be set by what it does, not by what it says.

A decree will be entered denying the petition for enforcement and setting aside the order.