**TYLER PIPE INDUSTRIES, INC.,
Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent, Cross-
Petitioner.**

No. 29123.

United States Court of Appeals,
Fifth Circuit.

June 1, 1971.

Thornberry, Circuit Judge, concurred specially and filed opinion.

Glenn L. Greene, Jr., W. Reynolds Allen, Jesse S. Hogg, Miami, Fla., George E. Seay, Robert G. Mebus, Seay, Gwinn & Crawford, Dallas, Tex., Greene, Hogg & Allen, Miami, Fla., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Elmer P. Davis, Director, Region 16, N.L.R.B., Fort Worth, Tex., Janet S. Morris, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for respondent.

Before O'SULLIVAN,* Senior Circuit Judge, and THORNBERRY and DYER, Circuit Judges.

O'SULLIVAN, Senior Circuit Judge:

Tyler Pipe Industries of Swan, Texas, seeks vacation, and respondent National Labor Relations Board asks enforcement, of a Supplemental Order and Decision of the Board, issued January 23, 1970. This Order, reported at 180 NLRB No. 136, required Tyler Pipe to recognize and bargain with the International Molders and Allied Workers Union, AFL–CIO. The controlling issue was whether a representation election, held on August 5, 1965, and which was won by the Union 902 to 758, should have been set aside because of improper pre-election conduct by the Union. The Regional Director, overruling Company objections, certified the Union as the bargaining representative of production employees of Tyler Pipe. Upon the Company's refusal to bargain with the certified Union, it was charged with an unfair labor practice.

The unfair labor charge was first disposed of by a trial examiner granting the Board's motion for judgment on the pleadings and upon the record made in the Regional Director's consideration of the Company's request that the election be set aside.[1] The Board adopted the trial examiner's findings and ordered the Company to recognize and bargain with the Union.

In Tyler Pipe & Foundry Co. v. N. L. R. B., 406 F.2d 1272 (5th Cir. 1969), this Court denied enforcement of the Board's order and remanded the cause "for a full hearing on the validity of the representation election." 406 F.2d at 1275. After a plenary hearing upon our remand, the Board and its trial examiner, Fannie M. Boyls,[2] concluded that the proofs taken pursuant to our remand and a reconsideration of its earlier procedures did not call for a different result than its previous order. The resulting order entered January 23, 1970, is the subject of this appeal.

We deny enforcement.

In this Court's earlier decision, we recited some of the false statements made and pre-election tactics employed by the Union organizers. The Board conceded

---

* Senior Circuit Judge, Sixth Circuit, sitting by designation.

1. No point would be served by detailed review of the procedural steps which preceded the granting of the Board's motion for judgment on the pleadings. It would appear that the order granting the motion was a holding that, taken as true, the charges that the company relied upon to have the election set aside did not disclose reasons for setting it aside.

2. Fannie M. Boyls was the same trial examiner who had granted the Board's motion for judgment upon the pleadings. Trial Examiner Boyls' first decision and the Board's order affirming it had been announced on November 4, 1966, and are reported at 161 NLRB 784.

the Union's falsehoods. In our opinion we said:

"The Board, in defense of its position, asserts that the Company, in certain instances, could have rebutted and offset the many false allegations. In those other instances where the Company had no opportunity to reply, the Board determined, albeit without a hearing, that the employees either were not, or could not have been affected by the Union's spurious methods. *We cannot accept the Board's complacency.*" 406 F.2d at 1274, 1275. (Emphasis supplied.)

We further said:

"Under the election conditions that existed in this case, the Board should conduct a full hearing to determine the effect of the Union's methods on the vote of the employees. In so doing, the Board should determine whether *there was a deliberate use of false propaganda* for, when 'the standards of election campaigning drop too low, the requisite laboratory conditions are not present, and the [election] must be conducted over again.' N. L. R. B. v. Houston Chronicle Publishing Co., [5 Cir.] 300 F.2d [273] at 278." 406 F.2d at 1275. (Emphasis supplied.)

We set out below the admittedly false statements by the Union's agents, the trial examiner's characterization of them, and her reason for finding that neither separately nor collectively did they impair the validity of the Union's election victory. These false statements, admittedly made by the Union agents, and other pre-election conduct persuade us now to conclude that:

"the standards of election campaigning [did] drop too low [with the consequence that] the requisite laboratory conditions are not present, and [the election] must be conducted over again." N. L. R. B. v. Houston Chronicle Pub. Co., 300 F.2d at 278 (5th Cir. 1962).

Early in the campaign, union organizers—not employees of the company—began to urge in speeches and otherwise that the United States Government was behind the Union and desired unionization of all workers. A handbill distributed at the plant gates during the two days immediately before the election illustrates such campaigning. This was its style:

"You will WIN YOUR ELECTION * * * because responsible people in all walks of life have repeatedly SUPPORTED THE RIGHT OF WORKING MEN TO ORGANIZE. President Kennedy, President Johnson, President Eisenhower, President Truman and others * * * Church Leaders of ALL FAITHS urge employees to organize * * * and the United States Government STRONGLY URGES employees to organize, and GUARANTEES you the RIGHT and PROTECTION. Only a few days ago, the United States Congress, in taking the first step to REPEAL Section 14B of the current Labor-Management Law, strongly supported the right of employees to have GOOD UNION ORGANIZATION.

"Although Presidents, Church Leaders and the United States Congress and Government urges Organization among employees. * * * The Board of Directors of Tyler Pipe and Foundry Company * * * because of their desire to GET RICHER at the expense and misery of their employees * * * would FOREVER DENY YOU the DIGNITY and RESPECT of organization * * *

"THEY WILL NOT GET AWAY WITH IT THIS TIME * * * You will WIN YOUR ELECTION, and will win by a large majority."

While this union conduct was not literally violative of the Board's rule announced in Peerless Plywood Co., 107 NLRB 427 (1953), it offended its spirit. This is the rule:

"Accordingly, we now establish an election rule which will be applied in all election cases. This rule shall be that employers and unions alike will

be prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election. Violation of this rule will cause the election to be set aside whenever valid objections are filed." 107 NLRB at 429.

Of this style of campaigning, the trial examiner said:

"* * * the Union never identified any church leaders as urging employees to organize and no basis appears for the Union's sweeping statement regarding church leaders."

However, as was her practice as to most all misstatements by the Union, she excused this misrepresentation as follows:

"Employees, however, would be in as good a position as the Union to appraise the truth of such a claim and I believe they would readily recognize it as organizational puffing and propaganda."

As to the Union's claim that the government was back of union organization, the examiner said:

"What troubles me more is the statement that the United States Government strongly urges employees to organize. * * * The fact that the Act may have as a purpose the encouragement of collective bargaining to eliminate or diminish the causes of industrial strife or unrest which interfere with the free flow of commerce, and may guarantee and protect the right of employees to organize, clearly does not warrant an inference that the United States Government urges employees to organize. Section 7 of the Act, as Union Representative Boyd surely knew, guarantees the right of employees to refrain from joining as well as their right to join labor organizations. *These false and irresponsible characterizations of the position of the United States Government are inexcusable and should be strongly condemned.*" (Emphasis supplied.)

Notwithstanding such condemnation, the examiner did not consider it as any impairment of the Union's victory. She observed:

"Nevertheless, the fact that the *statements were untrue and apparently deliberately made for the purpose of influencing* the employees' votes, does not mean that they did in fact have that effect." (Emphasis supplied.)

She then cited Anchor Mfg. Co. v. N. L. R. B., 300 F.2d 301, 303 (5th Cir. 1962), and N. L. R. B. v. Bata Shoe Co., 377 F. 2d 821, 829 (4th Cir. 1967) as sustaining her. Respectfully, we do not find that either of these cases, as claimed by the examiner, sustained an election where "the union had told employees that union contracts had the backing of the United States Government and the sooner they signed a union card, the sooner the Union and the United States Government could go to work." The examiner then refused to find the pamphlet destructive of the election's validity.

"I, too, while disturbed over the Union's *use of such reckless and unfounded characterization of the Government's position with respect to employees organizing,* am unable to conclude, on the basis of the leaflet alone, that the employees would believe or be influenced in their voting by such union tactics. A careful examination of the record discloses not a scintilla of evidence that any employee's vote was influenced by that circular." (Emphasis supplied.)

During three days preceding the August 5th election, the union organizers by radio broadcasts, told the company's employees that its owners and officers were getting wealthy by callous exploitation of its wage earners. Such broadcasts included the following:

"So, it appears that Mr. Warner, along with the Board of Directors of Tyler Pipe and Foundry Company are playing a cruel little game with the lives and futures of some 2000 people of Tyler Pipe. They are seeing just

how long they can keep you afraid, apart and unorganized. They are playing games with your future, the future of your wife and children. They don't want another chance to beat the Union, they want another chance to beat you, to oppress you and to keep you down. They want to beat you, *the very people that made them wealthy*. They want to continue to enjoy their puppet show every year, a show in which they sit up there in their leather chairs, pull the strings of hate and fear, and watch the results as you, the hardworking men, stay unorganized for another year. Now, fellows, listen to me. Let's stop this thing right now. Let's get together. Let's provide those things you want for yourself and for the little lady of the house and for those kiddos who you wouldn't take a million dollars. Let's unite. Let's go down to those voting places Thursday and tell the world that east Texas is ready to move to the top. Let's tell the Board of Directors at Tyler Pipe and Foundry Company that we've had enough of their deception." (Emphasis supplied.)

Mr. Charles Boyd, organizer for the International Molders and Allied Workers was then introduced with these words:

"To give you a brief idea of the financial status of Tyler Pipe and Foundry, we have Mr. Charles Boyd of the International Molders and Allied Workers Union, AFL–CIO, with us today. Mr. Boyd had made careful examination of the Company's sales and profits over the past four years and has statements for us concerning this matter. Mr. Charles Boyd."

Responding, Mr. Boyd said:

"I would like to discuss with the Tyler Pipe and Foundry employees some important facts, facts that I don't think they will ever see posted on the Company bulletin board. * * * First, let me say that the figures that I'm about to quote are not just imaginary figures, but figures of fact coming out of the Company office. Now sales for the year of 1961 amounted to $17,348,396. Sales for the year 1962 amounted to $20,061,618, an increase of nearly $3,000,000. Sales for. the year 1963 amounted to $24,370,303, an increase of over $4,000,000. Sales for the year 1964 amounted to $29,-236,592, an increase of $5,000,000. Now this means that within a four-year period sales by Tyler Pipe and Foundry increased nearly $12,000,000. This is astounding but these are the facts and the Company will not deny them. *What does this mean to the Company's Board of directors and stockholders. This means that these gentlemen and the principal stockholders, while in 1960 received 71¢ a share from their stock, in 1964 these same gentlemen received $1.42 per share on their stock, exactly twice as much as in 1960. What about their earnings in the years between 1960 and 1964. In 1961 each share of stock held by the members of this exclusive club paid $1.36 and in 1962, a share paid $1.14, in 1963, $1.22. Now this would make a total of $5.85 per share."* (Emphasis supplied.)

On August 2nd and 3rd the Union distributed a new style of handbill. Its main heading read, "Get Ready for the Greatest Show on Earth." A subtitle said, "Frighten Them, Fool Them, Beat Them and Forget Them," (description of the company's treatment of its employees). The text was grouped into "Acts". Act #2 contained the following:

"More, and More POSTERS, NEWSPAPER CLIPPINGS and HATE SLOGANS will be seen on the bulletin boards and in the plant * * * This is to Scare you out of your boots * * * but take a good look at these PHONEY SIGNS and clippings * * * they were made in Dallas, Texas and created by the Company attorney * * * This guy is paid to think-up ways to BEAT YOU

*  *  * *he's paid more for one day than you are paid in ONE YEAR *  *  * this guy is good in the art of deception."* (Emphasis supplied.)

Act #3 is directed at Richard Harvey, President of the Company.

"Richard (LITTLE RICHIE RICH-BOY) Harvey will step-up his so-called safety meetings and personal talks with small groups *  *  * *but he is not really interested in safety *  *  * SAFETY, only for himself in making sure his $100,000 (One Hundred Thousand Dollars) keeps coming in *  *  * you see, RICHIE* is head of the FREEDOM (for the rich) FORUM in Tyler and these boys just don't go for this business of EM-PLOYEE ORGANIZATION. He's playing it SAFE."

Act #4 is as follows:

"THE GRAND FINALE: Mr. Harvey himself *  *  * and in person *  *  * back from a long vacation in CANADA *  *  * and fresh out of a Board of Directors meeting, will make his *usual DEAR EMPLOYEE SPEECH telling you how much he appreciates the SEVEN MILLION DOLLARS his LOYAL EMPLOYEES have made for him *  *  * plus SIX and A HALF MILLION DOL-LARS you made for the Board of Directors & Stockholders *  *  * (see Moody's Manual of Industrials in Tyler Public Library/1965 edition-page 1732 for these facts)."* (Emphasis supplied.)

The figures as to the dividends received by the owners and officers as recited in Mr. Boyd's speech were false and, as the examiner found, were deliberately so. The fraud of their use was enhanced by the reference to "Moody's Manual of Industrials" in the Tyler Public Library. This manual did not support the assertions made and the page reference was inaccurate, foreclosing verification. In discussing Boyd's use of false figures, the examiner said:

"Boyd's *gross exaggeration* as to the extent of the employees' earnings for the stockholders *is reprehensible."* (Emphasis supplied.)

But here, again, she finds the reprehensible conduct without importance because,

"The very nature of these representations are such that they are likely to be taken *with a grain of salt* by the employees. *  *  * In my opinion Boyd's exaggerated claims are not the type of conduct which would reasonably tend to have any substantial impact on the election." (Emphasis supplied.)

The company and the union made a pre-election agreement that neither side would engage in electioneering subsequent to a pre-election conference held on the day before the election. The union ignored this agreement by continuing spot announcements on the radio through the day before and the day of the voting. It also continued to display a large billboard on a road near the plant, which stated the Union slogan— "Freedom from Fear—Security for the Future." As to the continued broadcasting, the examiner said "I conclude *  *  * that the Union engaged in a breach of faith by continuing them." She continued, however, that the question was "whether this breach of faith could reasonably be considered as having influenced any employee to vote for the Union or whether it in fact had any such results." She concluded, "I am convinced that it did not."

She wrote off the billboard's violation of the company-union agreement as follows:

"The presence of the billboard on the side of the highway *violates no Board rule* and I cannot understand how it could possibly have improperly influenced the votes of the employees." (Emphasis supplied.)

Consistent with her discounting the effectiveness of each of the union's unfair tactics, treated severally, the trial

examiner in her concluding finding of fact held:

"After carefully considering the subjective as well as the objective test in this case, I am not persuaded that *any misrepresentations or other misconduct* on the part of Union representatives or supporters had any substantial effect upon the vote of the employees." (Emphasis supplied.)

If the foregoing indicates that the examiner was of the view that the various acts of misconduct should be evaluated severally, she was in error. We have said,

"It is not the effect of any one of the objectionable acts standing alone, * * * but the combined effect of all of them, which must be considered." Home Town Foods, Inc. v. N. L. R. B., 379 F.2d 241, 244 (5th Cir. 1967). Accord Home Town Foods, Inc. v. N. L. R. B., 416 F.2d 392, 397 (5th Cir. 1969).

Several employees were called to the stand and asked whether they were affected by the Union's tactics. None testified that he voted for or against the Union because of the conduct set out above. This is indeed understandable and we are not impressed that an attack upon a representation election must fail unless there be confession by one or more of a company's employees that the union's tactics led to his vote. It is true that in our opinion of remand we directed that the "Board should conduct a full hearing to determine the effect of the Union's methods on the vote of the employees." 406 F.2d at 1275. We are of the opinion, however, that the "effect" of the Union's methods can be evaluated without direct evidence by company employees that they were affected by such methods. In N. L. R. B. v. Trancoa Chemical Corp., 303 F.2d 456 (1st Cir. 1962), the Court said:

"We are not clear whether the Board's expression 'preclude * * * freedom of choice' means that the burden is upon the respondent to show that the employees were necessarily misled,

or only that it is sufficiently likely that it cannot be told whether they were or were not. The latter is the appropriate rule. N. L. R. B. v. Trinity Steel Co., 5 Cir., 1954, 214 F.2d 120." 303 F.2d at 461.

In the cited case N. L. R. B. v. Trinity Steel Co., 214 F.2d 120 (5th Cir. 1954), this Court said:

"* * * and that when a record reveals conduct so glaring that it is almost certain to have impaired employees' freedom of choice, the election should be set aside. General Shoe Corp., 77 N.L.R.B. 124, 126. Clearly this reasoning should have been applied here for it seems to us that no one could in fairness or with any reasonable degree of assurance confidently say that the employees at the election would have unquestionably voted as they did vote if the misrepresentations hereinabove referred to had not been made." 214 F.2d at 123.

and we consider that the conduct of the Union in the case before us was "so glaring that it [was] almost certain to have impaired employees' freedom of choice."

Further discussion by us of controlling law would add nothing to what has already been said as to the limitations upon and the extent of our power. In Home Town Foods, Inc. v. N. L. R. B., *supra*, 416 F.2d at 400, we recognized the continued validity of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) as delineating the rules which here control us. Applying them, we hold that the Board's Decision affirming its trial examiner is not supported by substantial evidence and it is denied enforcement. We also apply the rule of N. L. R. B. v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 864 (5th Cir. 1966); N. L. R. B. v. Houston Chronicle Pub. Co., 300 F.2d 273, 278 (5th Cir. 1962); N. L. R. B. v. O. K. Van Storage, Inc., 297 F.2d 74, 75 (5th Cir. 1961), and hold that petitioner met its burden of proving the invalidity of the election.

Not until after this opinion had been initially prepared was its author aware of the decision of the Fifth Circuit in N. L. R. B. v. Southern Foods, Inc., 434 F.2d 717 (1970). Judge Dyer's opinion therein fully supports the conclusion expressed herein.

The election conducted by the Regional Director is hereby set aside.

THORNBERRY, Circuit Judge (specially concurring):

I agree that the Board's order should not be enforced, and therefore concur in the result.