**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ROLLIGON CORPORATION, Respondent.**

No. 82–4148.

United States Court of Appeals, Fifth Circuit.

April 11, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, Jolane Findley, N.L.R.B., Washington, D.C., for petitioner.

Fulbright & Jaworski, Brynley James, III, Houston, Tex., for respondent.

Before RANDALL and HIGGINBOTHAM, Circuit Judges, and McDONALD *, District Judge.

RANDALL, Circuit Judge:

The National Labor Relations Board has petitioned this court seeking enforcement of its bargaining order. The respondent, Rolligon Corporation, refused to bargain with the Board-certified representative of its employees, Oil, Chemical and Atomic Workers ("OCAW"), in order to challenge the Board's certification of the union over Rolligon's objections to the validity of the representation election.

Rolligon has raised three objections as bases for invalidating the election: (1) that the union abused the Board's subpoena procedure by subpoenaing a majority of Rolligon's employees for no legitimate purpose; (2) that while the union representative was serving the subpoenas, he misrepresented his status vis-a-vis the Board; and (3) that the union improperly used the Board's offices for an organizational meeting. Rolligon contends that we should set aside the election because these actions had a tendency to mislead the employees into believing that the Board had endorsed the union. For the reasons set forth below, we grant the Board's request for enforcement.

I. FACTUAL AND PROCEDURAL BACKGROUND.

Rolligon operates a factory in Stafford, Texas, where it manufactures off-road vehicles and special, large tires for use on those vehicles. The company employs approximately fifty people, of which about forty are in the bargaining unit at issue in this case.

The OCAW originally filed a petition seeking to represent Rolligon's employees in January, 1979. A hearing officer determined the appropriate bargaining unit on

* District Judge of the Southern District of Texas, sitting by designation.

February 28, 1979, and directed that an election be held. Rolligon subsequently advised the Board's regional director that the union's showing of employee interest was tainted because the organizing campaign had been conducted to a large extent by a Rolligon supervisor. The union withdrew its petition on March 6, 1979, and filed a new petition seeking to represent the same employees. Rolligon moved to dismiss this petition on the ground that a second petition could not be submitted within six months of the first absent a showing of good cause. Rolligon's motion was denied and a second election planned.

The union maintained that it had not known until the date of the first hearing that the person collecting signatures was a supervisor; it sought to have as many employees as possible present at the second hearing to avoid a second "surprise" by the employer about the union's conduct of the campaign. A number of employees expressed concern about employer retaliation if they attended. Union official Haynes informed the employees that, in order to prevent possible reprisals, he would obtain Board subpoenas requiring their attendance.

From March 15 until the day of the hearing on March 20, Haynes distributed twenty subpoenas, usually at the plant entrance. When the employees presented the subpoenas to their foremen to seek time off, company officials informed them that the subpoenas were invalid because they did not provide for witness and mileage fees, but that the company did not wish to prevent them from attending the hearing. The company set up a schedule permitting two employees to leave per hour, but the union convinced the employees to attend en masse.

Because there was considerable confusion about the validity of the subpoenas, Haynes arrived at the plant parking lot to serve additional subpoenas and to answer questions about the subpoenas' validity. Shortly after Haynes arrived, company officials informed him that he was trespassing and ordered him off the property. In response

to this order, Haynes replied that he was "acting as an agent of service and explanation of the National Labor Relations Board subpoenas." Haynes then carpooled to the hearing with twenty employees.

After the hearing, Haynes directed the employees to another room. He explained that steps had been taken to prevent reprisals against them for their attendance at the hearing. He also asked employees who had witnessed the altercation in the company parking lot to give statements to the Board investigators.

Because approximately half of the employees attended the meeting, the plant had been forced to shut down for a day. The employer explained to the employees that this shutdown, and the resulting loss of time and money, had been caused by the union. The manager also allegedly made an anti-union speech.

From the forty-one employees who were eligible to vote, twenty-four votes were cast in favor of the union and fifteen cast against it. There were no challenged votes. The company filed timely objections to the election alleging that the union had interfered with the conduct of the election by its misuse of Board subpoenas and Board offices and by its misrepresentation to employees serving those subpoenas. The union claimed that the Rolligon manager's allegedly anti-union speech made on the day after the hearing and the company's interference with the subpoenas constituted unfair labor practices.

The ALJ found that the union had abused Board processes by misusing the subpoenas in order to give the employees the impression that the union was strong and endorsed by the Board, and that the organizer had in fact misrepresented his status vis-a-vis the Board. The ALJ also found that Rolligon's interference with the subpoenas was an unfair labor practice, but that the post-hearing speech was not. He recommended that the election be set aside.

Rolligon, the union, and the general counsel all filed exceptions to the ALJ's decision. The Board overruled the ALJ and held that while the union's conduct with respect to

the subpoenas was improper, there had been no interference with the election sufficient to warrant setting it aside. The Board also concluded that the company's post-hearing speech was coercive and a violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1).[1] The Board rejected the ALJ's recommendation and certified the union as the exclusive bargaining representative of the company's employees.

■ Following certification, Rolligon refused the union's request to engage in collective bargaining. The union charged that Rolligon's refusal to bargain was an unfair labor practice. Rolligon admitted its refusal to bargain, but denied the validity of the Board's certification of the union.[2] The Board granted the general counsel's motion for summary judgment, finding that Rolligon had committed an unfair labor practice, and requiring Rolligon to cease and desist from interfering with the employee's section 7 rights, 29 U.S.C. § 157, and requiring the company to bargain with the union.

## II. THE ELECTION CHALLENGE.

■ Although this case comes before us on a petition for enforcement of the Board's bargaining order, we are essentially asked to overturn the Board's certification of the union as the employees' collective bargaining representative. We note at the outset that Congress has entrusted the Board with wide discretion in the conduct and supervision of representation elections and the Board's decision warrants special respect by reviewing courts. *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946). Our review is limited to the question whether the Board has reason-

ably exercised its discretion, and as long as the Board's decision is reasonable and based upon substantial evidence in the record considered as a whole, our view of the evidence is immaterial. *Contract Knitter, Inc. v. NLRB*, 545 F.2d 967, 971 (5th Cir.1977); *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 29 (5th Cir.1969).[3] On the other hand, we cannot abdicate our responsibility to make certain "that the Board [has kept] within reasonable grounds," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), and that the Board's decision is reasonably consistent with its earlier decisions. *NLRB v. Osborn Transportation, Inc.*, 589 F.2d 1275, 1279 (5th Cir.1979); *see also Monmouth Medical Center v. NLRB*, 604 F.2d 820, 823 (3d Cir.1979). The issue in this case is whether the Board's refusal to set aside the election is consistent with its earlier decisions concerning abuse of its own processes. We conclude that it is.

■ There is no doubt that the burden is on the party seeking to overturn an election to establish that the election was not fairly conducted. *Gould, Inc. v. NLRB*, 610 F.2d 316, 318 (5th Cir.1980). Further, Rolligon's task is made more difficult in this case by the union's wide margin of victory. *See Vicksburg Hospital, Inc. v. NLRB*, 653 F.2d 1070, 1076 (5th Cir.1981); *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364, 1366 (5th Cir.), *modified*, 618 F.2d 396 (5th Cir.1980); *NLRB v. Sumter Plywood Corp.*, 535 F.2d 917, 924 (5th Cir.1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977); *but see NLRB v. Trancoa Chemical Corp.*, 303 F.2d 456, 458 n. 1 (1st Cir.1962) (one-sidedness of election may show how successfully the employees have been misled).[4]

---

1. The Board's conclusion that the company's speech was an unfair labor practice is not before this court, since no one has appealed that portion of the Board's decision.

2. Because representation proceedings are not directly reviewable by the courts, an employer must refuse to bargain with a certified union in order to obtain judicial review of its objections to a representation election. *See NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 28 (5th Cir.1969).

3. Our standard of review is not altered by the fact that the Board and the ALJ disagreed. The ALJ's findings are simply to be considered along with the rest of the record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951).

4. Rolligon characterizes this as a "close election." An election in which the union obtained almost 63% of the vote can hardly be considered close.

Rolligon maintains that the Board applied the wrong test in rejecting the ALJ's recommendation that the election be set aside. The company claims that it had only to demonstrate that the union's misuse of the subpoenas[5] and Board facilities had a tendency to mislead the workers into believing that the Board had endorsed the union, *see Monmouth Medical Center, supra,* but that the Board incorrectly required a showing of impact on the election. We are not convinced that the Board's concern with the impact on the election was inconsistent with its earlier decisions or the decisions of this court, and we note further that there is substantial evidence to support the Board's decision even under Rolligon's test.

In this circuit, we have consistently examined the possible impact on an election in determining whether that election should be set aside where the successful party has made material misrepresentations during the campaign. *See, e.g., Contract Knitter, supra,* 545 F.2d at 971 (citing *Linn v. United Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966)); *Sumter Plywood, supra,* 535 F.2d at 920 (quoting *Golden Age, supra,* 415 F.2d at 30); *NLRB v. Bancroft Manufacturing Co.,* 516 F.2d 436 (5th Cir.1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). We also seem to have applied the impact test in cases where the conduct complained of allegedly created the impression of government endorsement. In *Vicksburg, supra,* the employer complained that the union had made material misrepresentations regarding strikes and that the union had distributed literature that led the employees to believe that the Board supported it in the election. Apparently making no distinction between the two types of misrepresentations, we stated:

> In order to gain the right to a new election, the hospital "has the entire burden of (1) offering 'specific evidence of specific events from or about specific people,' and (2) showing that these objectionable activities, 'when considered as a whole, either *tended to or did influence the outcome* of the election.' "

653 F.2d at 1075 (quoting *NLRB v. Klingler Electric Corp.,* 656 F.2d 76, 85 (5th Cir. 1980)) (emphasis added). We stated further that an election would be set aside only where the misrepresentation "may reasonably be expected to have a *significant impact* on the election." 653 F.2d at 1078 (quoting *Hollywood Ceramics,* 140 N.L.R.B. 221, 224 (1962) (emphasis added)).[6]

In our specific discussion of the alleged false impression of government support in *Vicksburg,* we may have suggested that as long as there is a false impression of government support, then the election may be set aside:

> [C]onduct by a union which creates the impression that the United States Government encourages employees to organize and join the union constitutes a sufficient basis to warrant setting aside the election.

653 F.2d at 1078.[7] In the case cited for this proposition, however, *Tyler Pipe Industries,*

**5.** Both parties agree that there was no legitimate purpose behind the union's subpoenaing of a majority of the company's employees and that the union therefore misused the subpoenas.

**6.** The Board overruled *Hollywood Ceramics* to the extent that it permitted the setting aside of an election on the basis of misleading campaign statements in *Shopping Kart Food Market,* 228 N.L.R.B. 1311 (1977). The *Hollywood Ceramics* test was then reinstated in *General Knit, Inc.,* 239 N.L.R.B. 619 (1978), but it was overruled once again and the *Shopping Kart* test reinstated in *Midland Nat'l Life Ins. Co.,* 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489 (1982). At present, the Board apparently "will not set elections aside on the basis of misleading campaign statements," but "will ... intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is." *Midland,* 110 L.R. R.M. at 1494.

**7.** In *Vicksburg,* since we agreed with the Board that the handbill did not create a false impression, there was no need to determine the possible impact on the election of the distribution of the handbills. Similarly, in *NLRB v. Osborn Transp., Inc.,* 589 F.2d 1275 (5th Cir.1979), we held that the Board could reasonably have decided that its agent's conducting of an unfair labor practice investigation, shortly before the election which the same agent supervised, in a motel room rented by the union, and in the

*Inc.*, 447 F.2d 1136 (5th Cir.1971), our concern was clearly with the possible impact on the election of the union's misconduct. We set aside the election because we were concerned that the union's distribution of handbills suggesting government support, along with other acts of misconduct, was conduct "so glaring that it [was] almost certain to have impaired employees' freedom of choice." 447 F.2d at 1142 (brackets in original) (quoting *NLRB v. Trinity Steel Co.*, 214 F.2d 120, 123 (5th Cir.1954)).

Rolligon relies heavily on cases involving forged or altered Board documents for its contention that an election must be set aside when an abuse of the Board's processes has a tendency to mislead the employees into believing that the Board has endorsed the union. *See, e.g., Monmouth Medical Center v. NLRB*, 604 F.2d 820 (3d Cir.1979); *Gleason Plant Security, Inc.*, 252 N.L.R.B. 890 (1980); *Armstrong Cork Co.*, 250 N.L.R.B. 1282 (1980); *GAF Corp.*, 234 N.L.R.B. 1209 (1978); *Allied Electric Products, Inc.*, 109 N.L.R.B. 1270 (1954). As the Second Circuit recognized, however, the Board's major concern continues to be with the possible impact on voters of campaign materials that misuse the Board's name and prestige. *Hall-Brooke Hospital v. NLRB*, 645 F.2d 158, 162 n. 5 (2d Cir.1981) (citing *GAF, supra*, 234 N.L.R.B. at 1210); *see also Allied Electric Products, supra*, 109 N.L.R.B. at 1272 (use of altered copies of Board ballot improper because of tendency "to interfere with a free choice in the election"). Further, the Board has steadfastly maintained that the misuse of Board materials is not a "*per se* ground for setting aside the election," *Thiokol Chemical Corp.*, 202 N.L.R.B. 434, 434 (1973), and it has refused to set aside elections where it found that its neutrality had not been compromised. *See Monier Roof Tiles*, 249 N.L.R.B. 703 (1980); *Alyeska Pipeline Service Co.*, 236 N.L.R.B. 1082 (1978).

The Board has recently narrowed the types of cases in which it will set aside an election on the basis of misrepresentations and abuse, thereby undercutting much of the Third Circuit's rationale in *Monmouth, supra*. The Third Circuit noted in *Monmouth* that there are "numerous types of misrepresentations [that] can have the impact, under *Hollywood Ceramics*, to warrant the setting aside of an election." 604 F.2d at 824. Since the Board has once again overruled *Hollywood Ceramics*, most of these misrepresentations will no longer warrant the setting aside of an election. *Midland National Life Insurance Co.*, 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489 (1982). The *Monmouth* court went on to note that the Board has been "particularly sensitive" to misrepresentations which create "the impression that the Board favors unions and unionization," 604 F.2d at 824, and that even under the Board's

> most relaxed attitude toward misrepresentations generally, the Board promised that: Board intervention *will continue* to occur in instances where a party has engaged in such deceptive campaign practices *as improperly involving the Board and its processes*, or the use of forged documents which render the voters unable to recognize propaganda for what it is.

*Id.* at n. 8 (quoting *Shopping Kart Food Market*, 228 N.L.R.B. 1311, 1333 (1977)) (emphasis in Third Circuit opinion). The *Monmouth* court then cited *Formco, Inc.*, 233 N.L.R.B. 61 (1977), as an example of "the Board's concern with protecting its neutrality." 604 F.2d at 824 n. 8. The Board overruled *Formco*, however, in *Riveredge Hospital*, 264 N.L.R.B. No. 146, 111 L.R.R.M. 1425 (1982), holding that the Board would "treat mischaracterizations of Board actions in the same manner as other misrepresentations." 111 L.R.R.M. at 1426. In *Riveredge*, the Board expressly distinguished the alteration of Board documents from a party's misstatement of Board actions:

presence of union representatives, did not violate the Board's position of neutrality. In a third case, we refused to set aside an election even though NLRB information sheets had

been found with union stickers on them because we were unable to determine who had committed the misconduct. *Bush Hog, Inc. v. NLRB*, 420 F.2d 1266 (5th Cir.1969).

There are crucial and material differences between the alteration of a Board document and a party's misstatement of Board action. In the former situation a party proffers what it claims to be an official statement of Board action. It is the Board which purports to speak through its document. In the latter case, the one presented here, we face only one party's representation of the Board's action. The Board's actions speak for themselves, and will show up any misrepresentation for what it is.

*Id.*

■ We are left then with an extremely narrow class of cases in which the Board will set aside an election on the basis of the union's (or employer's) misconduct, and neither party has been able to find a case involving a request to set aside an election on the basis of misuse of the Board's subpoenas. Even in the cases involving altered documents, the Board has continued to express its concern with the impact on the election. *See GAF, supra; Allied Electric Products, supra.* Under these circumstances, we are unconvinced that the Board was incorrect in perceiving the ultimate issue in Rolligon's election challenge to be the possible impact of the union's misconduct on that election.[8]

■ Further, while the Board spoke in terms of impact on the election, its decision seems also to have rested on the absence of any false impression of Board support for

the union, or in the terms of Rolligon's test, any tendency to mislead.[9] The Board overruled Rolligon's exceptions because its "examination of the record . . . reveal[ed] no support for the conclusion that the Union's ill-considered decision to subpoena employees en masse could reasonably have created an impression that the Board favored the Union or was in league with it." Record at 583. Our review of the record indicates that there was ample support for the Board's conclusion.

■ First, the Board disagreed with the ALJ's conclusion that Haynes had materially misrepresented his status vis-a-vis the Board when he was serving the subpoenas. Both the Board and the ALJ based their decision on Haynes' own recollection that he had described himself as "an agent of service and explanation of the National Labor Relations Board subpoenas."[10] Although this statement was made in a loud voice, it is not clear that any of the employees ever heard the statement. While the statement was not a legally precise definition of Haynes' status, it was not a material misrepresentation since the Board procedures do provide for personal service by the parties. *See* 29 U.S.C. § 161(4). Haynes made this statement in response to the company manager's ordering him off the premises; there is no showing that the statement was designed to do anything but explain Haynes' continued presence on company property. Under these circumstances, we

---

8. At oral argument, the Board suggested that a finding that the misconduct has created the impression of Board support might create a presumption of impact on the election. We need not decide today, however, whether there may be instances of Board entanglement that do not require the setting aside of the election because we agree with the Board that there was no improper entanglement in this case.

9. As the Board points out, the ALJ's recommendation seems to have been based on the fact that the union had misused the subpoenas, rather than on the possible effect of the union's misconduct on the employees themselves. The ALJ based his conclusion that the use of the subpoenas was designed "to create the illusion . . . that the union was strong and was specifically approved by the National Labor Relations Board," Record at 478, essentially on his find-

ing that the union had no legitimate purpose in obtaining the subpoenas. We agree with the Board, however, that the issue was not whether the union had abused the subpoena procedure, but rather whether this abuse created the impression that the Board had endorsed the union. Since the Board has not adopted a per se rule requiring an election to be set aside every time the Board's procedures have been misused, the mere fact of abuse should not have been the basis for setting aside the election.

10. The testimony of Rolligon's witness to the incident, vice-president Asel, was inconsistent. At one point Asel claimed that Haynes had described himself as an "agent of the Board;" at another point he could not recall what had been said.

cannot say that the Board's conclusion that Haynes' statement was not a material misrepresentation was incorrect.

Rolligon maintains that the union used the subpoenas to create the impression of Board approval of the union's actions, specifically that the Board would supply the means to cause a day-long work stoppage. The altered ballots and literature in the cases cited by Rolligon were a more direct suggestion of Board endorsement; those documents specifically urged the workers to make a particular election choice. The subpoenas said nothing about the election contestants: they merely directed the employees to appear at the hearing. Rolligon emphasizes that some of the employees were afraid that if they did not comply with the subpoenas, they could be cited for contempt or have trouble with the federal government. This is hardly a misunderstanding of the nature of a subpoena, and it says nothing about the connection between the subpoena and Board endorsement. As the Board points out, an employee compelled to attend a hearing for no reason, under the threat of federal sanction, could as easily have decided to vote against the union as for it.

Rolligon itself has set forth the strongest argument against a finding that the employees viewed the union's ability to obtain subpoenas as an example of Board endorsement. The employees testified that Haynes had obtained the subpoenas so that they could attend the hearing to show their support for the union without fear of employer retaliation. If the Board had already endorsed the union, there would have been no need for the employees to demonstrate their support to the Board. Rolligon characterizes the employees' testimony as a statement that they were informed that the Board was "cooperating" with the union against the employer. There was no such characterization made by the employees in the record; the employees simply explained that Haynes had obtained the subpoenas to facilitate their attendance at the hearing. We agree with the Board that, on this record, the union's misuse of the subpoenas did not create an impression of Board endorsement.

Rolligon's third contention is that the union's use of the Board's offices for an organizational meeting created the impression of Board endorsement. The record reveals that there was not really any organizational meeting. While the employees were waiting for the hearing to begin, Haynes and another union representative simply thanked the employees for coming down to the hearing and may have said something to the effect that the employees should stick together. After the hearing, Haynes talked to a few of the employees about whether they had witnessed the incident in the parking lot and asked them to make a statement. We agree with the Board's conclusion that the short meeting did not convey the impression that the Board favored the union. *Cf. NLRB v. Osborn Transportation, Inc.,* 589 F.2d 1275 (5th Cir.1979) (no undue entanglement where Board agent conducted investigation in union motel room in the presence of union representatives).

Finally, we note, as did the Board, that the alleged misconduct occurred two months before the election, but the employer did nothing to correct the situation. The existence of an opportunity to reply and to correct the misrepresentation is a factor to be considered in determining whether an election should be set aside. *Sumter, supra,* 535 F.2d at 923; *Golden Age, supra,* 415 F.2d at 31. In *Riveredge, supra,* the Board expressly rejected the statement in *Formco,* 223 N.L.R.B. at 62, that the existence of "time to respond is not a valid consideration with respect to" misrepresentations about Board actions. The Board stated that "there is no reason why the elected party cannot set the record straight in exactly the same manner and to exactly the same extent as it can respond to any other misrepresentation." 111 L.R.R.M. at 1426 n. 6. We see no reason to set the election aside when the employer has failed to avail itself of a lengthy opportunity to correct the employees' misconceptions, if any. We agree with the Board that if Rolligon had really

thought that the union's misconduct would have undermined the company's election position, it could and would have complained about the abuse. Even if it could not have quashed the subpoenas, it could have requested corrective action from the Board. Instead, it chose to do nothing and presented the union with a second "surprise" challenge after the union's election victory.[11]

Rolligon's argument that it could not correct the alleged misconception because it had been presented with a *fait accompli* is unpersuasive. Rolligon maintains that the damage was done once the union had demonstrated that the Board would supply it with the means to cause a plant shutdown. Rolligon could easily have explained that the subpoenas were not issued to cause the shutdown, and that in fact the union was guilty of misconduct in abusing the subpoena process. Such an explanation could well have caused the union's abuse of the subpoenas to backfire, and prevented the union's misuse of the subpoenas from giving it a partisan advantage.

III.  CONCLUSION.

The Board's recent decision to narrow the class of misrepresentations that will warrant the setting aside of a representation election is based on the recognition that employees are "mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it." *Midland, supra,* 110 L.R.R.M. at 1491 (quoting *Shopping Kart,* 228 N.L.R.B. at 1311). Similarly, both the Board and the courts have shown a reluctance to "censor or police campaign propaganda unless the misrepresentations are so substantial that the uncoerced desires of the employees cannot be determined." *NLRB v. Muscogee Lumber Co.,* 473 F.2d 1364, 1367 (5th Cir.1973). There is no doubt that the union abused the Board's subpoena procedure and that this abuse must be strongly condemned, but we agree with the Board that setting aside an election in which sixty-three percent of the workers have chosen the union as their representative is not the proper remedy. As the Board has recognized, employees are thinking individuals capable of recognizing misconduct for what it is. There is substantial evidence in the record to support the Board's conclusion that the union's misconduct was not likely to have created the impression that the Board favored one party over another.

Accordingly, the request of the National Labor Relations Board for enforcement of its order is GRANTED. Rolligon shall bear the costs of this appeal.

ENFORCED.

11.  We are not persuaded by Rolligon's contention that it did nothing because the first time it tried to take corrective action, it was faced immediately with an unfair labor practice charge. Its first corrective action included anti-union statements as well as suggestions that the subpoenas were invalid. It could have expected that those statements would have induced the union to file a charge. It is unlikely that a complaint to the Board about the union's abuse of the Board's processes would have had the same consequences.