**MONMOUTH MEDICAL CENTER,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Hospital Professional and Allied Employees of New Jersey, Intervenor.**

No. 78–1832.

United States Court of Appeals,
Third Circuit.

Argued March 22, 1979.

Decided Aug. 20, 1979.

Francis X. Dee (argued), Edward F. Ryan, Laurence Reich, Carpenter, Bennett & Morrissey, Newark, N. J., for petitioner.

Vivian A. Miller (argued), Kenneth B. Hipp, John S. Irving, John E. Higgins, Jr., Robert E. Allen, Elliott Moore, Washington, D. C., for respondent.

Alfred G. Osterweil (argued), Osterweil, Wind & Loccke, Edgewater, N. J., for intervenor.

Before GIBBONS and HUNTER, Circuit Judges, and MEANOR,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

### I.

This case is before the Court on a petition by Monmouth Medical Center (the Hospital) to review, and a cross-application of the National Labor Relations Board (the Board) to enforce, an order issued by the Board against the Hospital.[1] The order directs the Hospital to bargain collectively with the Hospital Professionals and Allied Employees of New Jersey (the Union). It is predicated on the Board's decision that the Hospital's refusal to bargain with the Union constituted an unfair labor practice in violation of section 8(a)(1) and (5) of the National Labor Relations Act.[2]

Whether the Hospital's refusal to bargain was an unfair labor practice depends on whether the Union was properly certified by the Board as the collective bargaining representative of the Hospital's employees. The Hospital alleged that the representation election which the Union won was flawed by improper pre-election conduct and that certification of the Union following such an election was therefore invalid. The Board rejected the Hospital's objection at the initial representation proceeding and declined to reconsider it at the unfair labor practice hearing. We conclude that the Board's certification decision was inconsistent with case law and with previous decisions of the Board itself and amounted to

an abuse of discretion. Since the Union was not properly certified as the bargaining representative, the Hospital committed no unfair practice when it refused to bargain. The Hospital's petition will be granted, the order will be denied enforcement, and the disputed election will be set aside.

### II.

On June 16, 1977, the Board conducted a secret ballot election in a unit consisting of the Hospital's full-time and regular part-time registered nurses and graduate nurses. Of approximately 320 eligible voters, 284 cast valid ballots. The Union won the election by a vote of 148 for the Union to 136 against the Union—an effective difference of six votes. The Hospital filed objections to the election, alleging *inter alia*, that the election should be set aside because the Union "misused and abused the National Labor Relations Board's processes to secure a partisan advantage in that it represented to unit employees, directly and indirectly, that the . . . Board endorsed [the Union] in the election". To support this objection, the Hospital submitted six pieces of literature which had been distributed by the Union during the pre-election campaign.

The first piece of literature, "Exhibit A", is an official Board-published election pamphlet, entitled "Your Government Conducts an Election", to which the message "Vote *Yes* June 16 MMC Auditorium" has been added by hand. At least ten of these altered documents were distributed to voters in May, 1977, by the co-chairperson of the Union's local steering committee.

This Court has jurisdiction of the petitions for enforcement and review under Sections 10(e) and (f) of the Act, *Id.* §§ 160(e)–(f) (1976).

---

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

1. The Board Decision and Order (Case No. 22–CA–8222, reported at 236 NLRB No. 104), was issued pursuant to Section 10(c) of the National Labor Relations Act, *as amended,* 29 U.S.C. § 160(c) (1976). Because the Board Decision and Order is based in part on findings made in a representation proceeding (Case No. 22–RC–7125, found at 234 NLRB No. 50), the record of that proceeding is also properly before us pursuant to § 9(d) of the Act, 29 U.S.C. § 159(d) (1976).

2. Section 8(a)(1) and (5) of the Act provides that: "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(1) & (5) (1976).

The second piece of literature, "Exhibit B", was mailed to unit employees on or about June 9, 1977. It states, in part:

. . . On June 13th, there will be a hearing at the National Labor Relations Board regarding the Unfair Labor Practices charged against the Hospital by members of your Steering Committee. *The NLRB conducts such hearings only after investigation and rendering merit to such charges.* [Emphasis added.] The [Union] has *not* nor could we be, charged with violating any standard of conduct or representation set to preserve the rights of employees. This hearing proves the Hospital cannot make such a claim. If Mr. Pilla attempted to file such a charge he would realize that he does not stand a chance in a formal hearing as the daily mutilation of the facts would not stand up as credible evidence at the Labor Board.

Prior to the distribution of Exhibit B, on March 22, 1977, the Union had mailed a letter, "Exhibit C", which reads in pertinent part:

. . . If any misguided friend of the administration, probably unaware that they are putting themselves in *criminal* jeopardy, threaten to take any negative action against you whatsoever for joining or showing interest in a union, that person has violated a federal law. (Emphasis added)

\* \* \* \* \* \*

WHAT CAN HAPPEN TO THOSE WHO COMMIT AN UNFAIR LABOR PRACTICE?

The law provides that those who commit such violations of the Labor Act can be fined up to $5,000.00 and possibly imprisoned up to one year, or both.

At about the same time that Exhibit B was mailed, the Union mailed another leaflet, "Exhibit D", which states in part:

*Something to think about*: The attorneys and agent of the National Labor Relations Board, to whom the hospital and the employees are subject to regarding collective bargaining, ARE UNIONIZED themselves. These people, who are privy to more information than anyone else regarding unions have chosen to unionize years ago. (emphasis in original).

When the experts have chosen this particular method, can it really be the wrong one?

Vote "Yes"

June 16th.

In early and mid-May, the Union mailed two additional leaflets. The first leaflet, "Exhibit E" states in pertinent part:

It is easier for the administrations anti-union campaign, financed with tax deductible hospital funds, to start rumors and spread half-truths than it is for us to send out letters correcting the intentional misinformation many people are being given. WE have nothing to gain by lying to you. When something you hear from the anti-union people contradicts what union organizers have told you, there is any easy way to find out who is telling the truth. Just call the Officer of the Day at the National Labor Relations Board at 645–2100. WE have nothing to hide.

The second leaflet, "Exhibit F", which was mailed within the same time period and context as Exhibit E, but to employees voting in an election unit not at issue here, states in pertinent part:

If you doubt in any way information given you by the administration or by a representative of the union, we urge you to call the National Labor Relations Board at 645–2100 to verify what you've been told.

The Regional Director of the NLRB conducted an administrative investigation into the Hospital's objections. In his Report on Objections, he concluded that Exhibits A and B were not objectionable, but that Exhibits C, D, E, and F were. Accordingly, he recommended that the election be set aside and that a new election be directed. Both the Hospital and the Union filed exceptions to the Regional Director's report. The Board delegated its authority to hear the exceptions to a three member panel. The

panel, in a 2–1 decision, overruled the Hospital's objections, effectively reversing the Regional Director, and certified the Union as the exclusive bargaining representative of the Hospital's registered and graduate nurses.

The Hospital refused to bargain with the Union, and an unfair labor practice hearing was commenced.[3] The proceeding was conducted by the same panel which had overruled the Hospital's objections to certification. At the hearing the Hospital defended its refusal to bargain by arguing that the Board had improperly overruled the Hospital's objections to the election and that, therefore, the Board's certification of the Union was invalid and could not provide the basis for finding an unlawful refusal to bargain. The panel rejected this argument, again by a 2–1 vote, and granted summary judgment in favor of the NLRB.

Since the Board's Decision and Order is premised upon its certification of the June 16, 1977 election, we must consider the validity of the Board's certification of the representation election.[4] We are mindful that the Board has "wide discretion" in establishing the procedure and safeguards for conducting representation elections, NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). Nevertheless, the Board's decision must be reasonably consistent with its previous decisions. In Memorial Hospital of Roxborough v. NLRB, 545 F.2d 351 (3d Cir. 1976) we observed:

In articulating the "basis for its order", the Board is free to refer "to other decisions or its general policies laid down in its rules and its annual reports." [NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 443 n.6, [85 S.Ct. 1061, 13 L.Ed.2d 951] (1965)]. However, where the Board has reached different conclusions in prior cases, it is essential that the "reasons for the decisions in and distinctions among these cases" be set forth to dispel any appearance of arbitrariness.[5] [Id. at 442, [95 S.Ct. 1061].

Id. at 357. Accord, NLRB v. Saint Francis College, 562 F.2d 246, 252 (3d Cir. 1977); St. Vincent's Hospital v. NLRB, 567 F.2d 588, 590 (3d Cir. 1977); NLRB v. Osborn Transportation, Inc., 589 F.2d 1275, 1279 (5th Cir. 1979) ("In exercising the discretion entrusted it in representation matters, the Board must faithfully adhere to the policies and procedures previously announced in its rules and decisions"). In reviewing a Board decision, we may not "abdicate" our responsibility to assure "that the Board keeps within reasonable grounds". Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

---

3. A certification decision is not a final order within the meaning of Sections 10(e) and (f) of the Act, and hence is not reviewable by this Court. AFL v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). Accordingly, the Hospital must "follow [the] circuitous route" of refusing to bargain with the Union in order to precipitate an unfair labor practice proceeding. Aircraft Radio Corporation v. NLRB, 519 F.2d 590, 591 n.2 (3d Cir. 1975). The unfair labor practice decision is final, so the petition for review is properly before us.

4. A factor here is the closeness of the election. In such cases, closer scrutiny of objections may be required of the Board. We bear in mind the admonition, nowhere adverted to in the Board's Decision, that where "an election is extremely close, even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election." Henderson Trumbull Supply Corp. v. NLRB, 501 F.2d 1224, 1230 (2d Cir. 1974). NLRB v. Skelly Oil Co.,

473 F.2d 1079, 1085 (8th Cir. 1973); NLRB v. Gooch Packing Co., 457 F.2d 361, 362 (5th Cir. 1972). See Aircraft Radio Corp. v. NLRB, 519 F.2d 590, 594 (3d Cir. 1975). Cf. NLRB v. Savair Manufacturing Company, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).

5. We note further that in Metropolitan Life Insurance Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) the Supreme Court held that the substitution of appellate counsel's "rationale or discretion" for that of the administrative agency would be "incompatible with the orderly function of the process of judicial review." Id. at 444, 85 S.Ct. at 1064. Accordingly, "courts may not accept appellate counsel's post hoc rationalizations for agency action." Id. Some of the Board's argument on appeal has been arguably impermissible under this standard. We have felt no need, however, to draw distinctions as the argument has been in any event unpersuasive.

## III.

The gravamen of the Hospital's complaint is that the literature mailed, distributed, and posted by the Union misrepresented the role of the Board in conducting representation elections and created the impression that the Board favored the Union in the June 16 election. The Hospital's position is that in thus misleading unit employees the Union compromised the statutory neutrality of the Board.

■ The Board assumes a supervisory role in representation elections. "It is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 NLRB 124, 127 (1948).[6] An important aspect of conducting a "fair and free election" has been to prevent the misrepresentation of material facts. In *Hollywood Ceramics Company, Inc.*, 140 NLRB 221, 224 (1962), the Board announced its general policy against misrepresentations which might reasonably be expected to have an impact on the election.[7] Numerous types of misrepresentations can have the impact, under *Hollywood Ceramics*, to warrant the setting aside of an election. But an area of particular sensitivity,[8] which has given rise to a body of specialized and rigorous rules, is

misrepresentation which creates the impression that the Board favors unions and unionization. Misrepresentation of this sort strikes at the heart of the election process, for the Board's perceived neutrality is essential to the guarantee of a "fair and free" choice by employees.

■■ The Board actively guards its neutral status and will intervene to prevent the improper involvement of the Board and its processes in representation elections. The Board "will not countenance the use of its name in a manner which gives the impression that the Agency has granted a party to an election its imprimatur or support." *GAF Corp.*, 234 NLRB No. 182, slip op. at 4 (1978). "Especially does [the Board] believe that no participant in a Board election should be permitted to suggest either directly or indirectly to the voters that [the Board] endorses a particular choice." *Allied Electric Products, Inc.*, 109 NLRB 1270, 1272 (1954). If the successful party to an election has misused Board processes to its partisan advantage, the election will be set aside. *Id.*

The full Board's most recent decision in the area of Board neutrality is *GAF Corp.*, 234 NLRB No. 182 (1978), which was decided after the representation decision in this case but before the unfair labor practice

---

6. *See Aircraft Radio Corp. v. NLRB*, 519 F.2d 590, 593 (3rd Cir. 1975) (". . . [I]t is clear that the Board is committed to an active supervisory role over the pre-election conduct of the contestants.") In *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), the Supreme Court recognized the Board's responsibility for insuring "fair and free choice of bargaining representatives by employees". It emphasized that:

The Board in its supervision of union elections may not sanction procedures that cast their weight for the choice of a union and against a nonunion shop or for a nonunion shop and against a union.

*Id.* at 280, 94 S.Ct. at 500, *quoting NLRB v. Tower Company*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946).

7. The Board departed from *Hollywood Ceramics* in *Shopping Kart Food Market, Inc.*, 228 NLRB 1311 (1977) when it announced that it would no longer set aside elections on the basis of misleading campaign statements. *Id.* at 1313. However, the Board has since returned

to the stricter *Hollywood Ceramics* rule, in *General Knit of California, Inc.*, 239 NLRB No. 101 (1978).

8. Even under *Shopping Kart*, which reflects the Board's most relaxed attitude toward misrepresentation generally, the Board promised that:

. . . Board intervention *will continue* to occur in instances where a party has engaged in such deceptive campaign practices *as improperly involving the Board and its processes*, or the use of forged documents which render the voters unable to recognize the propaganda for what it is. 228 NLRB at 1313 (emphasis added).

The Board's concern with protecting its neutrality was emphasized in *Formco, Inc.*, 233 NLRB No. 5 (1977). There, the Board held, "*Shopping Kart* did not change Board law with regard to improper use of the Board and its processes for election campaign purposes." *Id.*, slip op. at 3.

hearing. In *GAF* the Board held that the union had interfered with the election when it mailed a leaflet which contained language similar to that on the Board's election notice, even though the leaflet was entirely different from that used by the Board. "National Labor Relations Board an agency of the United States Government" appeared on the top right-hand corner of the leaflet. The top left-hand corner contained a rendering of the United States Capitol over which the words, "It's the law" had been superimposed. The union had clearly identified itself as the author of the leaflet by placing its name, address and logogram on the bottom. The context of the leaflet revealed that it was election campaign propaganda. Yet, a majority of the Board [9] held that the election should be set aside:

> As composed, the leaflet at the very least *creates an ambiguity* in the mind of its reader as to the document's originator. We have repeatedly held that the Board will not countenance the use of its name in a manner which gives the impression that the Agency has granted a party to an election its imprimatur or support. *E. g., J. Ray McDermott & Co.,* . . .; *Rebmar, Inc.* . . .; *Allied Electrical Products, Inc.* . . . As we stated in *Rebmar,* our concern is not with the substance of the material added to a portion of a Board document, but with the possible impact such propaganda may have on the freedom of choice of the voter. The Board cannot lend its name and prestige to a use which has the *tendency to mislead.* (emphasis added)

*Id.,* slip op. at 3–4.

*GAF* and the cases cited therein thus establish the test which is to be applied by the Board when deciding whether the Board's neutrality has been compromised. We turn to a discussion of whether the Board abused its discretion in applying these principles to the facts of the instant case.

## IV.

 Exhibit A is a sample of an official Board document which has been altered by the addition of a hand-printed partisan message. The Board concluded that the partisan message was readily identifiable as emanating from the Union, and that, in any event, a subsequent mailing of identical unmarked documents cured whatever damage the altered document might have caused. This conclusion does not appear to be consistent with previous decisions of the Board. In *United States Gypsum Company,* 124 NLRB 1026 (1959) the Board set aside an election in which the sole objection was that the union had affixed a union button in the "yes" box of a reproduction of an official ballot. The ballots, which were mailed to employees, were clearly stamped "sample", and were not in any other manner altered. In *Silco, Inc., Atlas Division,* 231 NLRB 110 (1977) the Board set aside an election where the employer distributed a hand-printed sample ballot with an arrow pointing to the "no" box. That the partisan message and the ballot itself were hand-printed did not "neutralize" or "justify" the document.

In *Allied Electric Products,* 109 NLRB 1270 (1954), the union distributed what purported to be a sample of the Board's official ballot, but which had a partisan message appended. The Board concluded that:

> The reproduction of a document that purports to be a copy of the Board's official secret ballot, but which in fact is altered for campaign purposes, necessarily, at the very least, must *tend to suggest* that the material appearing thereon bears [the Board's] approval. As there are many legitimate methods available to parties for disseminating campaign propaganda which clearly do not entail an *apparent*

---

**9.** *GAF* was decided by a 3–2 vote of the entire Board. The two dissenters in *GAF* constituted the majority in our case, it having been decided by a three-member panel. The opinion in the instant case relies on the same cases and the same analysis as did the dissent in *GAF.* In reference to that dissent, the *GAF* majority observed that the dissenters were "defin[ing] the words 'Board document' too narrowly and constru[ing] the principles of the cited cases too strictly." *GAF,* slip op. at 4. Thus, it appears that the Board has already rejected the analysis upon which the case we are reviewing is based.

*involvement* of the Board or its processes, we believe it is unnecessary to permit unlimited freedom to partisans in election cases to reproduce official Board documents for campaign propaganda purposes. (emphasis added).

*Id.* at 1272. In *Rebmar, Inc.*, 173 NLRB 1434 (1968), the Board applied the *Allied Products* rule to a Board document which was not a sample ballot. The union had distributed a handbill which in part consisted of a portion of the Board's election notice, but with a campaign message superimposed thereon.[10] The Board set aside the election, stating:

Our concern is not with the substance of the material added to the Board's official notice of election, but with the possible impact such a partisan message added to an official Board document, or copy thereof, might have on the freedom of choice of the voter.

\* \* \* \* \* \*

To duplicate a part of the Board's official notice and then to add to it a personal partisan message that may be interpreted by the employee as an endorsement by the Board of one of the parties to the election, and thus have an impact on the employees' freedom of choice, is, we think, an undesirable use of Board documents designed for another purpose. *That the Union's message in this case*

*may be arguably innocuous and that there may have been at most a narrow or technical violation of the Allied Electric Products* rule, *is clearly irrelevant.* Whether deliberate or unintentional, such action has a *tendency to mislead,* and we are of the opinion that the Board should guard against having its prestige put to such possible abuse.[11] 173 NLRB at 1434. (emphasis added; citation omitted).

In *GAF*, which did not involve a sample ballot, the Board found that mere ambiguity was enough to make a document objectionable, even though the document was clearly identified as emanating from the union, and contained only some language similar to that used by the Board in its election notices.

Exhibit A is an actual Board document and the union source of the appended partisan message is nowhere admitted. It would seem that, as in *Rebmar* and *GAF,* application of the *Allied Electric* rule is warranted.[12]

The Board, in its brief, attempts to distinguish *Silco* and *United States Gypsum* as "merely" being cases in which alteration was found objectionable. In reliance on *A. Brandt & Co., Inc.,* 199 NLRB 459 (1972), the Board concludes that, in Exhibit A, the "comments could not reasonably be construed by the employees as part of the

---

10. The message was described by the Board as follows:

One side of the handbill was a reproduction of that portion of the election notice entitled, "Rights of Employees" complete with the Board's seal and name. The only addition to this side of the handbill was a statement superimposed at the top to the effect that "The government protects your right to organize yourself in a union." The reverse side of the handbill contains an explanation, couched in broad generalized language, of what a union is, how a union functions, and what a collective-bargaining contract contains. Nowhere does the handbill refer to or mention the [Union] by name. (173 NLRB at 1434).

11. Even where the altered documents have not been official Board publications, the Board has relied on *Rebmar* to invalidate elections if the campaign literature appeared to compromise Board neutrality. In *J. Ray McDermott & Co., Inc.,* 215 NLRB 570 (1974) (where the statement "A great day for the I.A.P.D. Keep the faith and vote 'yes' when you receive your

ballot!!!" had been added at the bottom of a Regional Director's telegram) the Board concluded that "the employees could reasonably have believed that some or all of the partisan statements in the insert constituted an endorsement of the [Union] by the Regional Director." (*Id.*)

12. The facts of *Allied Products* are similar to ours. There, the union distributed a document which purported to be a sample copy of the Board's official ballot, which had been altered to include a printed "X" in the yes box. At the bottom was printed, "Do not mark it any other way—mark 'Yes' box only." 199 NLRB at 1271. The Board announced that it would "not permit the reproduction of any document purporting to be a copy of the Board's official ballot, other than one *completely unaltered* in form and content, . . . and upon objection . . . ., will set aside the results of *any* election in which the successful party has violated the rule." *Id.* at 1272 (emphasis added).

[Board's publication] but were readily identifiable by them as partisan comments emanating from the [Union] in relation to the election campaign". We are not necessarily persuaded that this conclusion is consistent with the cases discussed above or represents a reasonable application of the principles those cases represent. *Silco* itself said that alterations have been found permissible only in "a few cases". 231 NLRB at 110. The Board's conclusion is especially questionable in light of the fact that the election was close, and considering the emphasis in *GAF* on mere "ambiguity" and "tendency to mislead".[13] However, speaking now only to Exhibit A, we need not decide if the Board abused its discretion in approving this particular campaign material, as the remaining exhibits by themselves are sufficient to make out reversible error.

Exhibit B contains a Union reference to an unfair labor practice hearing and the Union's declaration that the Board had "render[ed] merit" to the charges. We read it in light of Exhibit C, which was sent out prior to the mailing of B and which incorrectly states that criminal penalties attach to those who have been found guilty of unfair practices. The Board excused Exhibit B as being only "inartfully drafted" and not a "substantial" or "patent" mischaracterization of a Board proceeding. Further, to the extent that there was a misleading inference that the Board had already found merit in the unfair practice charges the Board concluded that the harm was mitigated by the references in the letter to "hearings" and "charges". The Board found Exhibit C permissible because it did not implicate the Board's documents or proceedings and could not "reasonably have had an impact on the election."

The exhibits do implicate a Board proceeding—the unfair labor practice hearing. Exhibit B refers directly to such proceedings and Exhibit C misrepresents the penalties which attach to being found guilty in such proceedings. Misrepresentation of the import of being charged in an unfair labor practice hearing was condemned in *Formco, Inc.,* 233 NLRB No. 5 (1977). There the Board held that the Union interfered with an election when it distributed a letter stating that the employer was guilty of unfair labor practices.[14] The Board reasoned that since only the Board could find an employer "guilty" the Union's statement drew the Board into the election. In *ONA Corp.,* 235 NLRB No. 85 (1978), the Union distributed excerpted copies of a complaint and notice, and added the disclaimer that a hearing had been set and the employer had denied all of the allegations. The Board ruled that the disclaimer did not cure the violation of Board neutrality, since the excerpted document still "gave the appearance" that the Board had already concluded that the employer was guilty. Citing *Mallory Capacitor Co.,* 161 NLRB 1510 (1966), the Board held that the practice constituted "a misuse of [the Board's] processes in that such reproduction was reasonably calculated to mislead employees into believing that the Board had judged the Employer to have violated Federal law, whereas such was not the case." *ONA Corp.,* 235 NLRB No. 85, slip op. at 3 (1978).

The Board's second justification, that the exhibits could not reasonably have had an

---

13. The Regional Director, although finding that Exhibits C, D, E and F were objectionable, excused Exhibits A and B. He too relied on *Brandt.* However, *Brandt* was explicitly distinguished from *Rebmar* when it was decided. We think that especially after *GAF,* which was decided after the Regional Director made his findings, and which rejected a dissent grounded partly on *Brandt, Rebmar* is the more appropriate rule. Further, we recall that in a close election, "even minor misconduct cannot be summarily excused." *See* note 4 *supra.*

14. In *Gulton Industries—Femco Division,* 240 NLRB No. 73 (1979), the union had distributed preelection leaflets which mischaracterized a settlement agreement and led to the implication that the employer had been found guilty of unfair labor practices. The Board applied the rule in *Formco, Inc.* and set aside the election. It made no difference that the leaflets did not expressly state that "the Board" had found a violation, for the leaflets were reasonably calculated to create that impression. The application of *Formco, Inc.* in *Gulton* cannot be squared with our case, unless the Board's decision in our case represents an inconsistent application of the law, which applies to the misrepresentation of the import of unfair practice hearings.

impact on the outcome of the election, is based in part on an inappropriate test. It is the "tendency" to mislead and the creation of "ambiguity" which *GAF* and *Allied Products* identify as the critical issues to be weighed. Doubts on the question of whether the misconduct actually had an impact should have been resolved against certification. As the court observed in *NLRB v. Trancoa Chemical Corp.*, 303 F.2d 456, 461 (1st Cir. 1962), it is enough for the election to be set aside because of misrepresentation if the employer shows that "it is sufficiently likely that it cannot be told whether [the employees] were or were not [misled]." To the extent that the Board was concluding that no reasonable person could find the references misleading, the Board was directly contradicting its Regional Director without either an apparent or explained reason. The Director had concluded that, "The investigation revealed that [the Union] made numerous references to the National Labor Relations Board and/or the Act not only in Exhibit C but also throughout many of its campaign leaflets including Exhibits B, D and E. . . . The *unavoidable impact* of such repeated references to the Board and the Act had to be the creation of the impression in the minds of the voters that [the Union] had a certain expertise regarding Board processes and the Act and knew what it was saying. Therefore, by misstating the law as discussed above, [the Union], whether unintentional or deliberate, misled the voters to believe that their Employer was possibly guilty of criminal conduct." (Emphasis added) [15]

The Board's reliance on the reference to "hearings" are "charges" as mitigating the tendency to mislead is misplaced. In *ONA*, 235 NLRB No. 85 (1979), reference in the document to a "hearing" and to the employer's denial of the allegations was insufficient to cure the misleading statements. It is not at all clear that mere reference to "hearings" and "charges" in the text of Exhibit B is sufficient to serve as an effective disclaimer, even were disclaimers to be allowed.[16]

Exhibit D appears to strike at the heart of the Board's neutrality by suggesting that the attorneys and agents of the Board favor unions. It goes so far as to say that the Board favors the "particular method" of unionization upon which the employees were voting. The Board held, however, that an organization could not be presumed to favor unions simply because its employees were represented by a union and that therefore, there could have been no effect on the Board's neutrality. This completely misses the point. The question is not whether the unionization of its employees proves that the Board actually favors unions. Rather, the question is whether reference by the campaigning Union to unionization of the Board's employees would *create the impression in the minds of the voters* that the Board favors unionization.

The Board also concluded that if anything, this exhibit was "campaign propaganda" that employees would recognize and evaluate. We see no reason, and the Board advances none, to conclude that the employ-

---

15. Of course, we do not conclude that the Regional Director's conclusions should always override the judgment of the Board. Nevertheless, we are unpersuaded by the Board's rejection of those conclusions in this case, since there has been no reference to any countervailing circumstances or considerations. As the Supreme Court noted in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951):

> Evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. *Id.* at 496, 71 S.Ct. at 469.

16. As to whether there was opportunity to respond, which was suggested for the first time on appeal, *Formco, Inc.*, 233 NLRB No. 5 (1977), which involved a similar misrepresentation of the import of an unfair practice hearing, found that an "opportunity to respond" on the part of the employer was not a "valid consideration". As the Board observed:

> The impact of the Petitioner's message upon the freedom of choice of the voter is not amendable to credible or effective response by the Employer. Employees may well view any response by the Employer as an attempt to extricate itself from the damaging effects of an adverse finding by the Board by seeking to mislead them. *Id.*, slip op. at 5.

ees would recognize this particular literature as propaganda, or would look behind it and recognize that it misrepresented the Board's role in conducting elections.[17] This is especially so since the Board's finding ignores the conclusion of the Regional Director that "[the Union] cloaked itself throughout the election campaign with the appearance of certain expertise as to the purposes and procedures of the National Labor Relations Act and the Board." We do not see how the Board could hurdle from this finding, and the Director's finding quoted at paragraph 21 *supra,* to the conclusion that the misrepresentations were readily identifiable as propaganda.

Exhibits E and F are letters which referred voters to the Board should they have any questions about the Union. The Regional Director found that these items *alone* warranted the setting aside of the election. He concluded that the Union had impermissibly injected the Board into the campaign, and had suggested that the Board would respond to the employees' questions in a manner favorable to the Union.

The conclusion that these letters constituted impermissible interference in the election appears to be compelled by *GAF* and by *Formco, Inc.* in which the Board held: "Our concern is with the protection of our own processes, lest any voter be left with the impression that [the] Board is in favor of any party in an election. We are unwilling to condone any campaign statement *which even implies such bias.*" 233 NLRB No. 5, slip op. at 5–6 (emphasis added). In this case, the Board held that no document or proceeding was involved, and noted that referring employees' questions to the Board was allowed. The Board went on to say that anyone calling the Officer of the Day would have been told that he doesn't answer specific questions. Whether this is in fact the case is sheer speculation. In any event, the dissenting opinion from the Board's decision in this case effectively questioned the reasonableness of the Board's conclusion, observing that it was unlikely that employees would actually call the Board, so that the impermissible impression which had been created would remain. Moreover, the dissent noted that even if employees were to call and discover the Union's misstatement, this would not "render innocuous or justify" the Union's action.[18] We agree.[19] As the court noted

---

**17.** In *NLRB v. Trancoa Chemical Corporation,* 303 F.2d 456 (1962), the court was confronted with a similar Board conclusion and observed:

> In its Brief the Board concludes, "the common sense of the electorate can be trusted to evaluate and fairly discount campaign utterances." If this means to know instinctively what factual statements are untrue, this is a bit of hyperbole this court will not indulge in. *Id.* at 460 n. 5.

This sentiment was echoed by the Board itself when it tightened its supervisory control over misrepresentations generally in *General Knit,* 239 NLRB No. 101 (1978). The Board announced its "conviction that":

> No matter what the ultimate sophistication of a particular electorate, there are certain circumstances where a particular misrepresentation or misrepresentations may materially affect an election. In such circumstances, that election should be set aside in order to maintain the integrity of Board elections. · · ."

*Id.*

**18.** In pertinent part, the dissent concludes:

> Contrary to the position taken by the majority, it is obvious that the Union through

the disputed language was stating, in an unambiguous manner, that the Board "through its unionized attorneys and agents" is pro-union and that what the Union tells the employees "must be true because the Board will verify" its statements. That the Board will not do so is hardly relevant, for it is the likely impact on employees of the [Union's] misleading campaign propaganda involving this Board that is of concern here. The impact remains unaffected by the truth unless the unrealistic assumption is made that a substantial number of employees will call the Board and learn the truth—i.e., that the Board will not get involved in partisan matters. But even if the employees did not look behind such campaign propaganda, that would not justify or render innocuous the [Union's] gratuitous and improper attempt to make the employees believe this Board is not impartial.

234 NLRB No. 50, slip op. at 13–14 (1978).

**19.** *After the appeal was filed in this case a three member panel of the Board decided Donner Packing Co.,* 236 NLRB No. 220 (1978). In *Donner Packing,* the Board invoked *GAF* to set aside an election where the union had mailed letters which used the Board's name in a man-

in *NLRB v. Trancoa Chemical Corp.,* 303 F.2d 456, 460 (1962), "We do not think the Union made a half-page statement that it expected would affect no one."

## V.

For the foregoing reasons the Hospital's petition for review will be granted and the Board's cross-application for enforcement will be denied. The case will be remanded to the Board so that the disputed election may be set aside.

ner which created the impression that the Board supported the union. Member Murphy, who wrote the dissent in our case, noted in a concurring footnote that the literature at issue in *Donner Packing* was similar to the literature involved in our case. As between the result reached in *Donner Packing* and the result reached by the panel here, it is *Donner Packing* which seems to reflect a consistent development and application of the principles embodied in *GAF* and *Allied Electric.*