939 F.2d 74
 138 L.R.R.M. (BNA) 2001, 119 Lab.Cas. P 10,858
 NORTH AMERICAN DIRECTORY CORPORATION, Petitioner at No. 90-3446,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent at No. 90-3446,
and
Graphic Communications Union, Local 735-S, Intervenor at No.
90-3446.
NATIONAL LABOR RELATIONS BOARD, Petitioner at No. 90-3543,
and
Graphic Communications Union, Local 735-S, Intervenor at No. 90-3543,
v.
NORTH AMERICAN DIRECTORY CORPORATION, Respondent at 90-3543.
 Nos. 90-3446 and 90-3543.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 22, 1991.
Decided July 17, 1991.
 
 1
 Steven Semler (argued), Semler & Pritzker, Washington, D.C., for petitioner at No. 90-3446 and respondent at No. 90-3543, North American Directory Corp.
 
 
 2
 Peter Winkler, Joseph Oertel (argued), Jerry M. Hunter, Robert E. Allen, Aileen A. Armstrong, Robert F. Mace, N.L.R.B., Washington, D.C., for respondent at No. 90-3446 and Petitioner at 90-3543, N.L.R.B.
 
 
 3
 Ira Weinstock (argued), Edward Gleason, Ira H. Weinstock, P.C., Harrisburg, Pa., for intervenor at Nos. 90-3446 and 3543, Graphic Communications Union, Local 735-S.
 
 
 4
 BECKER and HUTCHINSON, Circuit Judges, and SMITH, District Judge.*OPINION OF THE COURT
 
 
 5
 D. BROOKS SMITH, District Judge.
 
 
 6
 Before the court are, at No. 90-3446, North American Directory Corporation's (North American) petition for review of a Decision and Order of the National Labor Relations Board (the Board) finding North American guilty of an unfair labor practice, and, at No. 90-3543, the Board's cross-application for enforcement of its Order requiring North American to recognize and collectively bargain with the Graphic Communications Union, Local 735-S.[1] We will deny North American's petition for review and grant enforcement of the Board's Order.
 
 I.
 
 7
 North American Directory Corporation prints telephone directories at its plant in Hazleton, Pennsylvania. In 1989, the Graphic Communications Union, Local 735-S, sought to organize the Hazleton plant's 64 production and maintenance employees, and filed its petition for election with the Board on June 14, 1989. North American and Local 735-S executed a standard stipulated election agreement calling for an election on July 20, 1989, and each side began distributing campaign literature. North American printed flyers on company memorandum letterhead which bore the company's distinctive printing press logo. They were mailed in company envelopes, and concluded with the exhortation "Vote Union No on July 20th."
 
 
 8
 On the day before the election, July 19, 1989, North American workers received a plain envelope containing a memo on what appeared to be paper copied from company memorandum letterhead. The memo contrasted an alleged attempt to reduce the salary of second shift workers by twenty-five cents with the amount of North American Vice President David Pilcher's weekly salary, a fact not generally known to the workers. It concluded with the amended exhortation "Vote Union--on July 20th." The existence of this mailing was not made known to North American until the afternoon of July 19, 1989. Because the election was scheduled to begin at the first and third shift change at 6:30 the following morning, less than twenty-four hours later, North American did not attempt to speak to its employees in response to the forged mailing. See Peerless Plywood Co., 107 NLRB 427, 429 (1953) (employer and union prohibited from making election speeches on company time within twenty-four (24) hours before election). The election resulted in a vote of 38 for and 26 against the Union.
 
 
 9
 North American filed an objection to the election results, alleging that the forged letter confused voters as to whether there had been a last minute change in North American's policy, and requested a hearing on its objection. North American submitted affidavits from Vice President Pilcher and nine employees, most of whom averred that there was confusion among the voting employees as to the origin and meaning of the letter. North American also submitted affidavits suggesting that the Union was responsible for the forgery and that an executive secretary who had recently been fired for suspected pro-union activity was responsible for providing the confidential salary information, company letterhead stationery, and mailing addresses of North American employees to the Union. The Board's Regional Director conducted an investigation and obtained an affidavit from the executive secretary denying her involvement in the forgery, as well as affidavits from two Graphic Communications Union representatives denying the Union's responsibility for the forgery and the mailing. North American filed a motion for the production of these affidavits.
 
 
 10
 The Regional Director of the Board recommended that North American's objection to certification of Local 735-S be overruled and that the Local be certified as the bargaining representative. The Regional Director did not, however, attach the three affidavits he had obtained to his Report and Recommendation, nor did he disclose them to North American despite its motion to produce. On November 20, 1989, the Board issued its decision certifying Local 735-S.
 
 
 11
 Following certification, Local 735-S demanded recognition by North American, but the company refused to bargain with the Local because of the forged pre-election mailing. Local 735-S filed an unfair labor practice charge, upon which the Board's general counsel filed a complaint and motion for summary judgment. The Board granted the motion for summary judgment and issued a cease and desist order on June 25, 1990. North American Directory Corp. and Graphic Communications International Union, AFL-CIO, Local 735-S, 298 NLRB 127 (1990). North American petitioned for review of the cease and desist order, and the Board applied for enforcement.[2]
 
 II.
 A.
 
 12
 North American's petition raises both an issue of procedure and an issue of substantive law. Procedurally, North American asserts that it was denied due process, or at least a fair application of the National Labor Relations Act, by the Regional Director's refusal to produce the affidavits received from the union and from the former North American employee during the course of his investigation. North American argues that because the affidavits were not produced (indeed its motion was not ruled on until months after the Board had certified Local 735-S as the bargaining agent) and did not become part of the record, the Board's decision adopting the Regional Director's recommendation and this Court's review of that decision are based on an incomplete record. Substantively, North American asserts that the Board's decision contravenes its longstanding policy, stated in Heintz Division, Kelsey-Hayes Co., 126 NLRB 151 (1960), that the Board would set aside any election in which parties distributed campaign propaganda which failed to identify its origin or sponsorship.
 
 
 13
 The Heintz Division rule, requiring a reversal whenever the source of campaign propaganda is disguised, was never applied as North American's broad phrasing of the rule suggests, and has been superseded by the Board's later decisions in Midland National Life Insurance Co., 263 NLRB 127 (1982), and SDC Investments, Inc., 274 NLRB 557 (1985). Although the denial of the requested affidavits by the Regional Director may in other cases conflict with the duty to provide a complete record for review, in the instant matter, we find no grounds for reversal of the Board's decision because the affidavits are irrelevant to our review of the Board's ruling on the dispositive question of fact in this matter, i.e., whether the last minute forgery could be reasonably believed by the employee voters to be election propaganda sponsored by North American requesting a pro-union vote.[3]
 
 B.
 
 14
 In 1960, the Board, in Heintz Division, set aside the results of an election because one of two rival unions had hired a racially mixed group of nonemployees to stand at the plant gates and distribute literature that asked employees to vote for the other union in the certification election. The Board, sensitive to the potential at that time for exploitation of a hostile reaction to the idea of a racially mixed union effort, stated:
 
 
 15
 Although the Board has traditionally declared that its policy is not to police preelection propaganda or methods of campaigning, we have not hesitated to do so when we have felt that corrective action was necessary. Thus, in cases of fraud and trickery when the employees involved are deprived of their ability to recognize propaganda for what it is and thus are deprived for (sic) their ability to evaluate properly the propaganda, we have set elections aside. In our opinion, the campaign tactics here employed by the Intervenor are equally pernicious. Such deception, because of the many imponderables involved in the selection of a bargaining representative, is fraught with the possibility of misleading and misdirecting the interests and desires of voters in many ways. We believe that the anonymous intrusion of the Intervenor into the Petitioner's campaign interfered with the employees' ability to properly evaluate the campaign appeal thereby addressed to them and was detrimental to the proper conditions for holding a free and fair election. Therefore, to insure that our elections are conducted under proper laboratory conditions, we hold that the failure of parties in Board elections to identify themselves as sponsors of campaign propaganda initiated by them constitutes grounds for setting aside the election.
 
 
 16
 126 NLRB at 153. (emphasis added) (citations omitted).
 
 
 17
 North American argues that Heintz Division's holding plainly bars the use of anonymous propaganda, and mandates the setting aside of the July 20, 1989 election. Heintz Division's authority must be examined in light of more recent Board precedent, however, specifically Midland National Life Insurance Co., 263 NLRB 127 (1982).[4]
 
 
 18
 In Midland National Life Insurance, the Board certified the results of an election which defeated union representation despite company-originated propaganda far more misleading than the memo objected to by North American. On the day before the election, Midland National Life Insurance Company included with its distribution of employee paychecks a six page document which contained pictures of a closed plant, accompanied by the text:
 
 
 19
 They too employed between 200 and 300 employees. This Local 304A struck this plant--violence ensued. Now all of the workers are gone! What did the Local 304A do for them? Where is the 304A union job security?
 
 
 20
 Id. at 128.
 
 
 21
 The leaflet did not state that the plant closed one and one-half years after the election, nor did it give the reason for the closing, thereby conveying the false impression that Local 304A's strike was responsible. Unflattering depictions in the document of union bargaining efforts at two other employers also were attributed to Local 304A, even though Local 304A had not been the bargaining representative involved in those unsuccessful negotiations. Finally, the document distributed included a selectively reproduced portion of Local 304A's 1979 financial disclosure form submitted under the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. Sec. 401, et seq., to the Department of Labor. The reproduced portion underscored total reported union receipts of $508,946, disbursements "On Behalf of Individual Members" at zero, and disbursements of $93,185 to union officers and $22,662 to union employees. Midland National did not include in its reproduction of the portion of the report showing no disbursements on behalf of individual members the instructions of the Department of Labor that the entry was to reflect disbursements only for "other than normal operating purposes," thus portraying the Local by indirection as parasitical and of no benefit to its membership.
 
 
 22
 The Board reviewed its regulation of campaign propaganda from the adoption of the National Labor Relations Act through Gummed Products Company, 112 NLRB 1092 (1955), in which the Board set aside an election for misrepresentation of facts, the announcement of the "laboratory conditions" test of Hollywood Ceramics Company, Inc., 140 NLRB 221, 224 (1962), that test's overruling in Shopping Kart Food Market, Inc., 228 NLRB 1311 (1977), and its revival by General Knit of California, 239 NLRB 619 (1978). Concluding that the cost of attempting to police the content of pre-election propaganda exceeded any benefit realized in the dissemination of more accurate information to voting workers, the Board announced its current policy:
 
 
 23
 In sum, we rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.
 
 
 24
 263 NLRB at 133 (emphasis added) (citations omitted). Later in the same year, the Board announced that it would treat misrepresentations of Board actions or positions the same as other propaganda. Affiliated Midwest Hospital, Inc. d/b/a Riveredge Hospital, 264 NLRB 1094, 1095 (1982). In the following year, the Board held that it would apply Midland National Life Insurance to objections alleging misrepresentations of law. Metropolitan Life Insurance Co., 266 NLRB 507 (1983). See NLRB v. Rhone-Poulenc, Inc., 789 F.2d 188, 190 (3d Cir.1986).
 
 
 25
 North American argues, however, that in Midland National Life Insurance the literature was identified as company sponsored propaganda, while in the instant election the forged memorandum was falsely portrayed to be the product of North American or at best of unknown origin. North American attempts to make nondisclosure of the source of the propaganda the basis for per se reversal of the election. North American's proposed per se rule is, however, contrary to the plain language of Midland National Life. Broadly stated, that case stands for the proposition that the Board will no longer examine campaign propaganda for alleged misrepresentations, and that the Board will intervene in cases involving allegedly forged documents only if the putative forgery renders "the voters unable to recognize the propaganda for what it is." 263 NLRB at 133. More generally, North American's argument ignores the philosophical basis of the Midland National Life Insurance rule which is that "employees are mature individuals who are capable of recognizing campaign propaganda for what it is," SDC Investment, Inc., 274 NLRB 556, 557 (1985); see also Corn Products Refining Company, 58 NLRB 1441, 1442 (1944), and the resulting policy that as long as campaign material is recognizable as propaganda of a particular party, the Board will leave the task of evaluating its contents solely to the employees. Midland National Life Insurance, 263 NLRB at 131. See generally NLRB v. Lovejoy Industries, Inc., 904 F.2d 397, 401 (7th Cir.1990).
 
 
 26
 Rather than as grounds for per se reversal, anonymous or falsely attributed campaign propaganda has been treated by the Board after Midland National as the necessary but not sufficient threshold for a case by case examination to determine whether the voter can "recognize propaganda for what it is." Midland National Life Insurance, 263 NLRB at 133. The Board expressly announced this two step procedure in analyzing purported Board documents distributed by a union for partisan purposes in SDC Investments, Inc., 274 NLRB 556 (1985). In SDC Investments, the union seeking certification prepared a leaflet displaying an official NLRB ballot to which a handwritten Spanish translation and the exhortation in Spanish "Remember to vote yes on December 16th" had been added. Rejecting on the basis of Midland National Life Insurance and Riveredge Hospital the recommendation of the hearing officer that solicitations using the altered ballot required per se reversal, the Board stated:
 
 
 27
 When the source of the altered document is not clearly identified, it becomes necessary to examine the nature and contents of the material in order to determine whether the document has the tendency to mislead employees into believing that the Board favors one party's cause.
 
 
 28
 274 NLRB at 557 (footnote omitted). Finding that the leaflet did not identify the union seeking certification as its source, the Board examined the document itself and concluded that the Spanish speaking members of the bargaining unit might be misled into believing that the Spanish translation of the official ballot was prepared by the Board. The Board further found that because the pro-union message was lettered in Spanish in the same style as the Spanish translation of the ballot, voters might conclude that the Board wanted them to vote "yes" in the election. Accordingly, the Board ordered a new election.
 
 
 29
 Applying the SDC Investments two step test in Worths Stores Corp., 281 NLRB 1191 (1986), the Board by contrast overruled objections to certifying a union election victory that charged the union with circulating a facsimile ballot embellished with pro-union messages which allegedly tended to mislead employees into believing that the Board favored the Union. Finding that the identity of the party responsible for the facsimile ballot was not clearly disclosed to the employees, the Board then examined the altered ballot itself. The Board concluded that the distributed propaganda, because its partisan stance was readily apparent, was capable of being evaluated as propaganda. See also NLRB v. Rhone-Poulenc, Inc., supra at 190-91; C.J. Krehbiel Co., 279 NLRB 855 (1986); Rosewood Manufacturing Co., 278 NLRB 722 (1986).
 
 
 30
 It is therefore clear that Heintz Division is limited to its peculiar facts and that, after Midland National Life,
 
 
 31
 while the introduction to eligible voters of forged or altered ... documents may still result in the setting aside of an election because the partisan nature of such misrepresentations is not evident, partisan misrepresentations recognizable as such will not.
 
 
 32
 NLRB v. Rhone-Poulenc, Inc., supra at 190.
 
 C.
 
 33
 The Regional Director found that the forged memorandum was readily identifiable as having been prepared by someone other than North American and as containing pro-union propaganda, and concluded that an employee could not reasonably believe that North American had changed its opinion at the last minute and was now asking them to vote for Local 735-S. App. 24-25. The Board subsequently adopted his findings and conclusions. App. 76. This Court must uphold the Board's findings if supported by substantial evidence. Molded Acoustical Products v. NLRB, 815 F.2d 934, 937 (3d Cir.), cert. denied, 484 U.S. 925, 108 S.Ct. 286, 98 L.Ed.2d 247 (1987); Vitek Electronics, Inc. v. NLRB, 763 F.2d 561, 569 (3d Cir.1985). The test applied by the Board and endorsed by this Circuit to evaluate claims of improper pre-election influence is an objective one, and requires reference in this matter only to the allegedly misleading information. Worths Stores, Inc., 281 NLRB 1191 (1986); see Molded Acoustical Products, Inc. v. NLRB, 815 F.2d 934, 939-40 (3d Cir.), cert. denied, 484 U.S. 925, 108 S.Ct. 286, 98 L.Ed.2d 247 (1987).
 
 
 34
 North American's campaign literature bore a distinctive letterhead with "North American Directory Corporation" and a printing press logo across the top. The company memorandum form was headed by boldface lines stating "Memo To:"; "From:"; "Subject:"; and "Date:"; the page ended with an outline boldface postscript "VOTE UNION NO ON JULY 20TH." The forged memorandum bore the same letterhead, but the "From" line is omitted and the text of the memo is in a different typeface which appears to be the product of someone's home computer printer. The postscript is altered, apparently by applying correction fluid to the "NO" in "VOTE UNION NO ON JULY 20TH" and drawing a dash where "NO" had appeared on the original. The forgery is, in short, an amateur production which appears as such even to the observer unfamiliar with North American's election propaganda. Additionally, the Regional Director quite properly observed that there was no reason for the employees to believe that North American, after campaigning vigorously against the Union, had reversed its stance on the eve of the election. See State Bank of India v. NLRB, 808 F.2d 526, 539 (7th Cir.1986). The Board's conclusion that it was recognizable as partisan propaganda is supported by substantial evidence.
 
 III.
 
 35
 We turn next to North American's argument that the Board's cease and desist order should not be enforced because of the Regional Director's refusal to disclose the ex parte affidavits which he took from the alleged sources of the forged memorandum. North American asserts, with some merit, that judicial deference to the Board's findings and conclusions is inappropriate when the complete record of the proceedings before the Regional Director was not only kept from the parties, but also not made part of the record transmitted to the Board.
 
 
 36
 National Labor Relations Board Rule 102.69(g)(1)(ii), 29 C.F.R. Sec. 102.69(g)(1)(ii) (1990), provides for Board review and ultimately judicial review, in a proceeding in which no hearing is held on the objections to certification, of the portion of the record before the Regional Director which includes "any documentary evidence, excluding statements of witnesses, relied upon by the regional director in his decision or report." A party can append to the record before the Board any affidavits which it has obtained, id., Sec. 102.69(g)(3), but has no means of including confidential affidavits not disclosed by the Regional Director. See Summa Corp. d/b/a Frontier Hotel, 265 NLRB 343 (1982). The Board's rules appear to be in conflict with Section 9(d) of the Act, 29 U.S.C. Sec. 159(d) (West 1973), and 28 U.S.C. Sec. 2112(b) (West 1982), which provides for the filing in this Court of a record consisting of
 
 
 37
 the order sought to be reviewed or enforced, the findings or report upon which it is based, and the pleadings, evidence, and proceedings before the agency, board, commission or officer concerned.
 
 
 38
 * * * * * *
 
 
 39
 If ... the correctness of a finding of fact by the agency board, commission or officer is in question all of the evidence before the agency, board, commission or officer shall be included in the record.... (emphasis added).
 
 
 40
 This Court has not expressly addressed the effect of the failure of the Board to prepare a full record, see NLRB v. ARA Services, Inc., 717 F.2d 57, 69 (3d Cir.1983) (in banc) (issue waived), but see St. John's General Hospital of Allegheny--ADR Center v. NLRB, 825 F.2d 740, 742 n. 3 (3d Cir.1987) (issue dismissed without discussion), although other Circuits have denied enforcement because affidavits were not made part of the record. See e.g. Prairie Tank Southern, Inc. v. NLRB, 710 F.2d 1262, 1265 (7th Cir.1983) (Rosenn, J., by designation). We find that we need not address it in this matter because the missing affidavits are not relevant to a review of the Regional Director's findings, and if the Board was in error, it was harmless error.
 
 
 41
 The affidavits which the Regional Director did not disclose purportedly concern union responsibility for the forgery. The Board asserts that they need not be disclosed because the Regional Director assumed union responsibility for the forged mailing; North American disputes this characterization of the Regional Director's Report and Recommendation and argues that the question of union responsibility is relevant under Heintz Division. In either case, the affidavits are not and cannot be relevant to the question which under the controlling law, as stated in Midland National Life Insurance, is dispositive: could the forged document be readily recognized as propaganda.
 
 
 42
 Because the affidavits were not relevant to the Regional Director's findings or the Board's review, we hold that the refusal to provide the affidavits was not under these circumstances an abuse of discretion. Cf. Anchor Inn, Inc. v. NLRB, 644 F.2d 292 (3d Cir.1981) (allegations of unlawful conduct which would require certification be overturned if proved true entitle moving party to evidentiary hearing.)
 
 
 43
 The Order of the Board will be enforced.
 
 
 
 *
 Hon. D. Brooks Smith, District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The National Labor Relations Board had jurisdiction over this matter pursuant to Section 10(a) of the National Labor Relations Act, 29 U.S.C. Sec. 160(a) (West 1973), because North American, during 1988-89, shipped goods valued in excess of $50,000 from its Hazelton plant to points outside Pennsylvania. This Court has jurisdiction of the cross appeals pursuant to section 10(f) of the Act, 29 U.S.C. Sec. 160(f) (West 1973), and Fed.R.App.P. 15
 
 
 [2]
 See Medical Center of Beaver County v. NLRB, 716 F.2d 995, 997 n. 2 (3d Cir.1983). (because certification order is not a final order, an employer must expose itself to unfair labor practice charges to obtain judicial review of the certification order)
 
 
 [3]
 North American secondarily argues that the Board abused its discretion by failing to conduct an evidentiary hearing on the issues of Union responsibility for the forgery and the existence of confusion among the voters as to the meaning of the forgery. Because, as we discuss in part II.C, infra, objections to certification based on pre-election propaganda must be decided by an objective evaluation of the propaganda itself, the issues of Union responsibility and voter confusion, even if proved in favor of North American's position, would not warrant setting aside the election. Refusal to hold a hearing on these issues was therefore not an abuse of discretion. Cf. NLRB v. ARA Services, 717 F.2d 57, 67 (3d Cir.1983) (in banc) (hearing only necessary where objection raises "substantial and material" factual issue which if proved true would warrant setting aside election.)
 
 
 [4]
 The Board has never cited Heintz Division as authority to bar anonymous propaganda across the board. The Board adopted the trial examiner's findings, which distinguished Heintz Division, in Grafton Boat Co., 173 NLRB 999, 1004 (1968) ("the rule in Heintz was expressly aimed at campaign standards 'so lowered that the uninhibited desires of the employees could not be determined' " (quoting Heintz Division)) in an analysis of anonymous propaganda that presaged the Midland National rule. With respect to the motivating issue in Heintz Division, the Board had adopted a standard expressly for evaluating campaigns affected by attempts to exploit racial prejudice in Sewell Manufacturing Co., 138 NLRB 66, 71-72 (1962). See S. Lichtenberg & Co., Inc., --- NLRB ---, 296 NLRB No. 167 (1989). Indeed, in A. Brandt Co., Inc., 199 NLRB 459 n. 4 (1972), the Board's sole post-Grafton Boat Co. citation of Heintz-Division, it appears that the Board considered Heintz Division only as restating the "laboratory conditions" rule of Hollywood Ceramics Company, Inc., 140 NLRB 221 (1962)